## Coleman v. Hanger, et al.

(Decided June 19, 1924.)

### Appeal from Fayette Circuit Court.

1.  Corporations—Written Memorandum of Agreement with Stockholders to Purchase Stock, Written by One of Them Hurriedly and Unsigned, Not Binding.—In action to enforce agreement for

sale of corporate stock, made by plaintiff with three stockholders, unsigned, written memorandum of agreement given plaintiff subsequently at his request by one of stockholders held not binding, especially where admittedly contradictory of real agreement.

2. Corporations—Verbal Agreement for Purchase of Corporate Stock Held Present Sale Under Evidence.—Agreement by plaintiff with three stockholders for purchase of certain number of shares of stock, at a sum to be determined by a future valuation, held a present sale of stock, under evidence.

3. Corporations—Purchaser of Stock to be Valued in Future Held Entitled to Investigation of Valuation, After Long Delay in Tendering Certificate.—Under oral contract for purchase of corporate stock, to be valued at reasonable time in future, although delay in fixing value was not so great as to excuse purchaser from taking stock when tendered, he was entitled to reasonable time to investigate correctness of valuation, and refusal to accept certificate, when offered without such opportunity, would not estop him from setting up his claim.

4. Corporations—Inclusion in Valuation of Assets of Account which Had Subsequently Proved a Liability Not Unreasonable.—In suit on oral agreement for sale of corporate stock, at valuation to be determined in future, inclusion among assets of account, which at time of agreement was rated as profitable and at time of valuation as secured, by city's promise to reimburse, held not arbitrary or unreasonable, notwithstanding it had subsequently proved total loss.

5. Corporations—Plaintiff Suing for Accounting as Equitable Owner of Corporate Stock Not Required to Execute Bond.—In suit to enforce oral sale of corporate stock at valuation to be determined in future, in view of large credit apparently due purchaser and fact that no question of his solvency had been raised, execution of bond against any deficit his account might show held not essential, but court could require payment of any balance due stockholders before delivery of stock to purchaser, and give them lien thereon for security.

6. Corporations—Directors Could Not Engage in Rival Business to Detriment of Corporation.—Although duty owed to corporation and its stockholders by directors as trustees for their benefit would not preclude them from bona fide entering into other business of same nature, they could not, in good faith, engage in rival business to its detriment.

7. Corporations—Stockholder Held Improperly Denied Opportunity to Participate in Purchase of Stock of New Corporation Organized by Directors.—Where directors of corporation organized new company of same general nature as old, and to transact the same business, stockholder in old company held entitled to notice and opportunity to participate in purchase of its stock, proportionate to his holdings in old company.

8. Corporations—Interest Properly Allowed on Dividends Due Equitable Owner Under Oral Sale of Corporate Stock and on Amount

Purchaser Owed for Stock.—In suit for performance of oral agreement to sell corporate stock at valuation to be fixed in future, where parties failed to agree on valuation or amount due. plaintiff as dividends, interest on value of stock held proper item, and that plaintiff should also have been credited with interest due him as dividends from date they were paid.

HELM BRUCE, ALLEN & DUNCAN and BRUCE & BULLITT for appellant.

HUMPHREY, CRAWFORD & MIDDLETON and HUNT, NORTHCUTT & BUSH for appellees.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

This is a suit in equity against certain stockholders in a corporation arising out of the alleged breach of an executory contract of sale of certain shares of stock at its value, such value to be later ascertained, but not being fixed for seventeen months thereafter. From a judgment dismissing his petition plaintiff appeals.

The case has been prepared with great elaboration and can be best understood by a recital of the facts in chronological order.

The Mason-Hanger & Coleman Company, a construction company, was incorporated in 1906 with a capital stock of 1,000 shares of the par value of $100.00 each. The plaintiff, Thomas H. Coleman, owned 150 of its shares, but sold all his holdings to the other shareholders in 1907.

The corporation changed its name to the Mason-Hanger Company, and made a phenomenal success. In the year 1917 the corporate stock was held by H. B. Hanger, Silas Mason and J. J. Watts, 310 shares each, and Jerry Sullivan 20 shares, treasury stock 50 shares, all of the parties being on friendly terms with Coleman.

In February, 1917, an engineer in charge informed Coleman of a large contract to be let in New York, and advised him to associate himself with a strong company and make a bid thereon.

Coleman took the matter up with Hanger, who suggested that the Mason-Hanger Company would make a joint bid with him, but Coleman did not wish to assume so much individual responsibility and proposed to purchase 150 or 200 shares of stock in that company. Hanger expressed a willingness to sell him some of his stock if Mason and Watts would do likewise. This was not

pressed at the time, but the parties investigated the New York proposition and decided not to bid on it.

In April war was declared with Germany. Shortly thereafter Hanger went to Washington city, and in June secured a contract for the construction of Camp Taylor, near Louisville. He informed Coleman of the trip, wrote him while there, and upon concluding the contract notified him to meet him in Louisville.

Coleman met him and had a conversation with him on the evening of June 24th, in his room at the Seelbach hotel. This was followed by a similar meeting on the evening of June 25th, at which Mason and Watts were present. Hanger first proposed to employ Coleman on the Camp Taylor job at a salary of $500.00 per month. Coleman demurred, saying that he had expected to purchase stock in the company. Hanger indicated his willingness to sell the stock but not for it to participate in the contract, saying that it was a cost plus contract upon which there was a certain profit.

After considerable discussion a verbal contract was made at the second meeting by which Coleman was employed in the Camp Taylor work at a salary of $600.00 per month and ten per cent of the net commissions received by the company on the first $1,500,000.00 expended, this percentage being equivalent to $10,500.00. Also Coleman agreed to buy and the three parties agreed to sell him 200 shares of stock in the company, an equal amount to be furnished by each seller, the stock to be delivered when its value was ascertained; it being further agreed that the stock sold him should not participate in prior contracts made by the company and then unfinished, nor in the Camp Taylor contract. As to this all the parties are agreed.

There is a disagreement as to how the value should be ascertained and as to the division of the earnings upon future contracts earned prior to the ascertainment of the value of the stock.

Coleman claims that Mr. Hanger made the following proposition, which was agreed to by all: "We will sell you 200 shares of stock as soon as the value can be ascertained. You and Mr. Mason and Mr. Watts to value the plant and any contract taken before this stock is valued and bought you are to have one-fifth in its profits. You are to have an interest on the same basis as the stock, which is one-fifth."

On the other hand, Mr. Hanger states that at the second meeting he informed Messrs. Watts and Mason that he had promised to sell Mr. Coleman fifty shares, if they would do likewise, the stock not to participate in the Camp Taylor contract or other contracts then in existence; that Mr. Coleman interrupted, saying that he wanted 200 shares, to which he, Hanger, responded, "I will sell you 66 2/3 shares if you all (Mason and Watts) will each sell him the same;" that Mason and Watts agreed to that, and that he then said to Mr Coleman, "I am willing to take in payment for my stock the valuation that is placed on it by Mr. Mason and Mr. Watts;" that Mr. Coleman agreed to this, and he, Hanger, added, "It is understood that this stock that you are purchasing has no bearing on the Camp Taylor contract nor any bearing on any profit that we have in existing contracts; that the Mason-Hanger Company will complete these contracts now engaged in," and that this was agreed to by all. In this he is fully corroborated by Mason and Watts.

A few weeks thereafter Coleman requested Hanger for a written statement of the contract, and the latter wrote out and gave him an unsigned instrument, reading, "My understanding 10% of our profits on the first $1,-500,000.00 and nothing more except salary. 200 shares will be sold as soon as value of stock can be agreed upon by the stockholders. If any new contracts are taken before the value of the stock is fixed and same bought the interest in the new work will be considered on the same basis as stock, namely, 1/5."

Mr. Hanger claims that this was a hurriedly written paper, prepared at the instance of Mr. Coleman at a time when he was quite busy, while Mr. Coleman claims that it was prepared after full deliberation and in response to a paper on the subject that he had delivered to Hanger. The work on Camp Taylor had then begun and was being prosecuted with great vigor.

In the meantime, new opportunities came with amazing rapidity and the company's prospects continued to rise, with an ever-expanding horizon. In September it was awarded a contract by the government to build a large aviation camp at Lake Charles. Mr. Mason and Mr. Coleman were placed in charge. Large sums of money were required for the prosecution of the work. The company advanced $100,000.00 and Mr. Mason borrowed $300,000.00 in its name. In addition he assessed the stockholders $300,000.00 and Coleman advanced $60,-

000.00 of his private funds as his part. That contract was practically completed by the first of January, 1918, and Coleman went to Newark, N. J., to assist in the construction of certain terminals at that place under a profitable contract in which the Mason-Hanger Company had a fifty per cent interest.

A few days afterward the company received an exceptionally good contract in the construction of a powder plant at Nashville, Tenn., and Mr. Mason and Mr. Coleman took charge of that work. Shortly thereafter the government notified the company that its services might be needed in the construction of terminals at Charleston, S. C. The proposed work was to cost twenty to twenty-five millions of dollars, and the contract was a favorable one. Mr. Hanger conducted the negotiations. A New corporation was then organized under the name of the Mason-Hanger Contracting Company, with a capital stock of $250,000.00, and having the same business and objects as the Mason-Hanger Company. It was also composed of the same stockholders, except an engineer in the employment of Mason and Hanger was given a few shares of stock, and no stock was offered to or taken by Coleman. The Charleston contract was awarded to it. The subscribed capital stock of this company was paid, $150,000.00 in cash and Liberty bonds, and $100,000.00 in consideration of the contract above named. Thereafter both corporations continued under the control of the same officers.

It is urged by Coleman that all of the cost plus contracts and those in which there was a sure profit were thereafter taken by the new corporation, and all those in which there was an element of risk were assigned to the old one. Further, that during the period from June 1, 1917, to November 25th, 1918, Mason, Hanger and Watts, respectively, drew in salaries from the two corporations the sum of $86,000.00 each, while, aside from his commissions on the Camp Taylor job, he did not receive anything from the company; that his salary at Camp Taylor, Newark and Nashville was paid by the federal government, and that he was not paid anything while acting as a member of the firm at Lake Charles.

During all that time Coleman continued to insist on a valuation of the stock, having at different times made a personal appeal to each of the sellers to attend to this; but they were so engrossed with other business that it was deferred from time to time.

The Mason-Hanger Company declared two dividends, one in May, 1918, of 170% and the other of 200% in the fall of 1918. The 170% dividend seems to have been declared out of the earnings of the Camp Taylor contract, in which Coleman did not participate. Its declaration coincides in time with the organization of the Mason-Hanger Contracting Company, and the amount paid the various stockholders corresponds closely with the amount of their respective subscriptions to the new company, and it is reasonably probable that such subscriptions were paid by that dividend. Upon the declaration of the second dividend Hanger sent Coleman a check for $37,200.00 as his part of that dividend on 186 shares of stock, and wrote him a letter stating:

" . . . You will note that we are handing you check No. 3726 in payment of 1/5 of dividend accruing to Mr. Mason, Mr. Watts and myself on 930 shares, this being dividend from Nashville work which we have advanced to you pending the value of the stock being settled. When the value of this stock has been agreed upon, you will pay for 186 shares, one-third each to Mr. Mason, Mr. Watts and myself. You will understand that in paying you this dividend that it is an advancement and purchase of the stock to be made by you has no bearing whatever upon the assets of Mason & Hanger Company outside of the Nashville and Lake Charles work. . . . "

Coleman returned the check with the statement that he did not understand the letter, and for that reason could not accept the check, but was willing to accept it on account. It was retained by Hanger, and later the directors rescinded the resolution declaring the dividend, and applied the earnings represented by it to the payment of indebtedness due by it to its stockholders for the moneys advanced on the Lake Charles contract. No other dividends were declared, though the profits of the Nashville contract appear to have exceeded $900,000.00. A short time after the events above stated, Coleman consulted counsel and a demand was made upon defendants for a settlement.

Thereupon bookkeepers were put to work, a trial balance and inventory made as of date June 25th, 1917, and Coleman was notified that Mason and Watts had valued the stock, and a meeting was arranged at the residence of Mr. Hanger.

At this meeting he was advised that the value of the stock was fixed at $450.00 per share. Coleman raised a question as to his share in the profits, claiming a one-fifth interest therein. A controversy arose and the meeting broke up without any conclusion being reached. Later in the day Mr. Watts and Mr. Mason called upon Mr. Coleman at his home in Harrodsburg and made him a tender of a certificate of the stock. A discussion ensued in which reference was made to the delay in estimating the value of the stock and the right of Mr. Coleman to examine the books and inventory, as well as his right to participate in profits as a partner.

Coleman declined to accept the stock until he consulted with his attorney. Following this, other negotiations proved fruitless and this suit was filed.

The petition sets out the parol agreement; alleges that the writing delivered by Mr. Hanger to Mr. Coleman evidenced the substance of the contract and relies upon it as the basis thereof, and recites the facts with much elaboration. It then proceeds upon the theory (1) that the contract was for the purchase of stock *in futuro,* to take effect when Coleman, Watts and Mason should ascertain and agree on the value of the stock; (2) until the value of the stock should be ascertained, Coleman should participate in all contracts taken between those dates as a partner with the corporation in the proportion of one-fifth to four-fifths; (3) that the conduct of defendants in diverting the funds of the corporation to the payment of unreasonable salaries before plaintiff became a stockholder in the Mason-Hanger Company and in organizing a new company and making a discrimination in its favor to the prejudice of the old one was a fraud upon plaintiff's rights, entitling him to recover one-fifth of all the net profits earned on the various contracts taken by both companies subsequent to June 25, 1917, and relieves him from any obligation to take stock in either; (4) though, if the court is of the opinion that he should take and pay for the Mason-Hanger stock, he is willing and consents to do so, and submits himself to the court and offers to do what in the opinion of the court he is obligated to do under the contract and under the facts developed, the prayer being for specific and general relief. Watts was not served with process, and the action proceeded against Mason and Hanger.

Their answers traverse the allegations of the petition, pleaded appellees' version of the contract, and al-

lege that the stock was valued in accordance with the contract and tendered to Coleman, who refused to accept or pay for same, and this is pleaded in bar of his action.

Much proof was taken as above set out, and upon submission, the court referred the matter to the master commissioner to, take further proof and ascertain and report the financial condition of Mason-Hanger Company on June 25th, 1917, and November 23, 1918, and much additional evidence was taken thereon and report filed. An expert accountant for plaintiff was also permitted to examine the books of the company and make report thereon, so that all in all many volumes of evidence appear in the record.

Without going into the great mass of detail shown by the evidence it may be said that, in addition to the facts above stated, it appears that some time prior to June 25th, 1917, the Mason-Hanger Company and a firm known as McArthur Brothers had separate contracts for subway construction in Brooklyn, N. Y. They pooled their interests in those contracts by organizing a corporation known as the Mason-Hanger-McArthur Bros. Company, with a capital stock of $100,000.00. Of this stock Mason-Hanger Company took $50,000.00; it also loaned to McArthur Brothers $37,000.00 with which to pay for their stock in that corporation; further, Mason-Hanger Company became surety on the bond of that corporation for the faithful performance of the work, and also loaned or advanced other moneys to it for the prosecution of its work.

On June 17th, 1917, the company was indebted to Mason-Hanger on the matters indicated in the sum of $174,422.96, which was carried as an asset on the books of the latter company. At that time the Brooklyn contract was considered profitable and continued to so appear for some time thereafter; however, by the summer of 1918, the ranks of labor were depleted by enlistments in the army and the demand for laborers was increased by war contracts, causing a marked advance in wages, which resulted in a strike and shut down in this work. To obviate delay, the city officials agreed with the contractors that, if the latter would proceed with the work to a conclusion, the city would reimburse them for any loss they sustained by reason of the increased cost of material and labor.

This was acceded to but the Mason-Hanger-McArthur Brothers Company did not have sufficient funds for

this purpose and these were advanced to it by the Mason-Hanger Company, the contract being completed at a loss of approximately $650,000.00. Afterwards a bill was enacted by the New York legislature validating the contract to reimburse the contractors for the loss they had incurred. While sustained in the lower courts, that act was held invalid in McGovern v. City of New York, 234 N. Y. 377, and the loss fell upon the contractors. .

The circuit court was of the opinion that the contract in question was in parol; that it constituted a sale of the stock as of date June 25th, 1917, the value to be ascertained by Mason and Watts within a reasonable time thereafter; that as to prior contracts, including that of Camp Taylor, plaintiff was not to participate, but as to future contracts he was entitled to one-fifth of the dividends of the company; that while Watts and Mason were to value the stock they were not authorized to make an arbitrary valuation; and in view of the length of time elapsing before such valuation was made, the plaintiff should have been given reasonable time and opportunity to investigate the matter, and therefore is not precluded from ascertaining his rights in this action by his refusal to accept the stock tendered in 1918. Also that the item charged to Mason-Hanger-McArthur Brothers Company in the inventory made by Mason and Watts was a valid asset on June 25th, 1917, and that the general valuation then made was fair, but that by reason of some minor corrections in the inventory the true valuation of the stock at that time was $445.00 per share, instead of $450.00 as fixed by Mason and Watts.

It was further the opinion of the court that Mason, Hanger and Watts, as officers of the Mason-Hanger Company, were trustees for the benefit of the stockholders of that company; that when they organized the Mason-Hanger Contracting Company with the same stockholders aside from Coleman and for the same purposes and objects as those sought by the former company, it was their duty as such officers to give Coleman, as equitable owner of stock in the old company, an opportunity to participate in the stock of the new company; that failing in this he should now be accorded that opportunity to participate in such stock held by them.

In accordance with the above view a conditional decree was rendered against Hanger and Mason awarding plaintiff against each of them 67 shares of stock in the Mason-Hanger Company at the price of $445.00 per

share, or a total of $29,480.00, with interest from November 23, 1918, to be credited by any losses that had been incurred on that amount of stock on contracts entered into prior to June 25, 1917, and subsequently paid by the company, and also of the dividends earned and declared on contracts taken since that date, exclusive of the Taylor contract.

Plaintiff was allowed thirty days in which to pay for this stock or to execute bond to be approved by the court for the faithful performance of the judgment. If this was done, the case was then to be referred to the master commissioner to ascertain and report any losses subsequent to June 25th, 1917, on contracts entered into before that date, and also all dividends earned and declared on the stock since that date. But should he fail to pay for the stock in cash or execute bond therefor his petition should be dismissed.

It was further provided that if plaintiff accepted this relief that he should also have an option to purchase from Mason and Hanger each, 175 shares of the capital stock of the Mason-Hanger Contracting Company at the price paid therefor by them at its organization, to-wit, $60.00 per share, with interest from that date, to be credited by such dividends as the court might thereafter find had been paid thereon during such period. Plaintiff was given sixty days for investigation and taking proof on this question, during which time he was also afforded access to the books of that company; and if he exercised that option he was required to execute bond to the defendants to be approved by the court for the performance of the obligation.

Plaintiff in open court declined to execute either bond or to pay cash for the stock, whereupon his petition was dismissed, and he appeals and again contests all the issues suggested above.

The unsigned writing of H. B. Hanger relied on by plaintiff as the basis of his action is an admission upon the part of that defendant as to the terms of the agreement, and indicates the construction that he placed upon it; but for obvious reasons it cannot be considered the contract between the parties. The contract had theretofore been fully agreed upon by all four of them, and in the preparation of this paper there was no consultation between them, or agreement that it was to be accepted as superseding the parol agreement. It omits all reference to nonparticipation in uncompleted prior contracts, a

stipulation of the agreement in which all concur, and upon which Coleman specifically relies. It states that the value of the stock was to be made by the stockholders, while Coleman insists that it was to be valued by himself, Watts and Mason, and the other parties say by Mason and Watts alone. It is not claimed that these matters were omitted from the writing by fraud or mistake, and as it is complete in itself, if it were to be regarded as a contract it could not be aided by parol evidence. But as it is admittedly contradictory of the real agreement and was not intended to supplant it, the cause of action is clearly based on the verbal contract.

Considering the contract as verbal and without entering into a detailed discussion of the evidence, we think that it is reasonably clear that it was intended as a present sale of stock; that this stock was not to participate in the profits or losses of the Camp Taylor contract or in the unfinished contracts taken prior to that date, but that it was to participate in dividends earned on all new contracts on the basis that plaintiff was the equitable owner of one-fifth of the stock, and until his stock was valued and issued he was to receive one-fifth of the dividends earned on such contracts. Such seems to have been the construction the parties placed upon it. In a number of conversations this was indicated by Coleman himself. While at Lake Charles he drew no salary from the government on the theory that he was an officer of the company; he advanced his *pro rata* of the funds for the completion of the work in the same way as did the other stockholders. He was omitted from the May, 1918, dividend declared from the Camp Taylor earnings, but was sent a check for his supposed one-fifth of the dividend declared on the Nashville job. Also, all along he evinced a desire for the immediate possession of the stock, showing that he did not anticipate the completion of any certain contract before it was issued.

The weight of the evidence is that under the agreement the value of this stock was to be ascertained by Mason and Watts; it was contemplated that they should do this fairly and within a reasonable time. In view of the immense undertakings assumed by the company which were engrossing the business activities of all of its stockholders we do not think the delay in fixing the value excused the plaintiff from taking the stock when tendered him; this delay did not affect his dividends on the stock. On the contrary, an earlier valuation would have called

for an earlier payment on his part; he was relieved of this, although the company was under a constant strain to secure ready money to carry on its business, and this was rather to the prejudice of the sellers. However, after this long delay, plaintiff should have had reasonable time and opportunity to investigate the correctness of the valuation, and his action in declining to accept the certificate of stock under the circumstances ought not to estop him from asserting his claim.

It is strongly urged that the Mason-Hanger-McArthur Brothers Company account was a liability of $650,000.00 instead of an asset of $174,426.00, and therefore the valuation fixed by Mason and Watts was unfair and arbitrary and not binding on plaintiff, even under defendants' construction of the contract.

However, the evidence is clear that on the 25th of June, 1917, the former company was solvent, with $100,000.00 of profit on hand to its credit, and with a favorable contract from which it would have secured a large profit had it not been for the great advance in the price of labor and material thereafter. True, there was a contingent liability, but it was so remote as not to have been seriously regarded, being a risk of the character that is daily taken by business men, so that we think that Watts and Mason were justified in including it as an asset, and that the court did not err in so holding, or in fixing the valuation of the stock as it did.

Appellant contends that the delay in valuing the stock, the manner of valuation, the princely salaries allowed defendants to the exclusion of plaintiff, and the formation and functioning of the new company are all parts of a fraudulent scheme to eliminate plaintiff from participating in the business, and that under such circumstances he cannot hope for fair treatment in the future, and that the only equitable judgment that can be rendered is to allow him damages for the alleged breaches of the contract.

On the other hand, appellees insist that plaintiff was given an opportunity to share in the good will of a money making concern and the labors of its members, into which he had placed neither capital nor patronage; that the overhead expenses, including income tax, are very heavy and that plaintiff has conceived the idea that by claiming to be a partner he may avoid participation in these, and thus receive a profit far in excess of the other stockholders.

Perhaps there is some basis for each theory; perhaps both are wrong; certainly both are exaggerated. The contract was fair and under the circumstances no significance can be attached to the delay in fixing its value; the parties fixed this at $450.00 per share; the court has fixed it at only $5.00 per share less, and based this on tangible property, allowing nothing for good will. True, there were losses as stated, but these developed after the purchase and at the time of the valuation were considered to be secured; moreover, individual liability therefor is freely admitted by defendants.

The salaries allowed defendants were large, and in a proper case in which the corporation was made a party an investigation of that question could be had, but under the pleadings it cannot affect this action, and we refrain from expressing any opinion thereon. This, however, will not prevent plaintiff from amending his petition and making it a party on the return of the case.

Passing the questions involved in the formation of the Mason-Hanger Contracting Company, from the above conclusions, it would seem equitable to award to plaintiff as against each defendant sixty-seven shares of stock in the old company at the value fixed by the court, with interest from the 18th day of November, 1918, and credit him in each instance with 7% of all the dividends declared by the old company subsequent to June, 24, 1917, and 7% of the net losses paid out by the old company after the 24th day of June, 1917, on contracts theretofore executed, with interest from the respective dates of such dividends and payments, and to charge him with 7% of the net profits earned on the Camp Taylor contract and such other contracts, if any, as were executed prior to June 24, 1917, and from which a profit was realized and paid to the company subsequent to that date, these matters to bear interest from the date such net profits were realized by the company.

The formation and conduct of the Mason-Hanger Contracting Company and its effect upon appellant's rights presents a more difficult question. As directors of the old company the defendants were trustees for its benefit. This would not preclude them from *bona fide* entering into other business of the same general nature; but they could not in good faith engage in a rival business to its detriment. Cov. & Lex. R. R. Co. v. Bowler's Heirs, 9 Bush 468; Thompson on Corp., vol 2, sec. 1242; Corpus Juris, vol. 14a, pages 121-125; Coop on Corp.,

6th ed., 1947. In this the directors of the old company owed a duty to its stockholders as well as to the corporation itself.

It may be that they thought the capital stock of the old company was too small for the nature of their business, and that it would be stabilized by increasing it proportionately to the amount of the business, and that this would equalize the percentage of profits; they may have also thought that this could best be accomplished by the organization of a new concern by the same people and under the same management and that their business might be developed better by two companies than by one. Perhaps they had other laudable intentions, but in doing this plaintiff should not have been ignored.

If they had merely increased the capital stock of the old company, under the statute he would have been entitled to notice and to participate in the purchase of the increase. Scheirich v. Otis-Hidden Co., 204 Ky. 289. The equities are much stronger in favor of plaintiff in this case, as here the proportion of his stock is not merely decreased without notice to him, but a rival company is organized which is bound to be injurious to his interest, as it is not shown that the old company could not have transacted all the business done by both.

Ordinarily relief of this character should be sought in an action against the directors by the corporation or in a suit to which it was a party. However, in this instance the defendants were not only trustees for the corporation and stockholders in their official capacity as directors, but as individuals they also held the legal title to the stock of which plaintiff was the equitable owner and therefore exercised a private trust in his behalf.

It is clear that as individuals they acquired stock in the new company by virtue of their ownership of stock in the old company, and that the business of the new company was developed through the good will theretofore established by the old company and by their efforts while acting as directors of the latter company. In so doing they received the earnings that would have been received by appellant except for the formation of the new company, and in equity and good conscience they should be required to account to him therefor.

The judgment of the chancellor permitted him to acquire stock in the new company as of the date of its organization and to participate in all the dividends there-

after. No doubt this was equitable if plaintiff desired that stock, but his pleadings did not indicate a desire for this character of relief, and he should have been granted relief in this particular without imposing upon him a condition to purchase more stock.

In this view of the matter it seems to us that plaintiff was also entitled to recover of each appellee 7% of the net profits earned by the new company from its organization up to the time of the filing of this action, with interest from the date that same was earned, and that he should be charged with interest on $10,500.00, this being 7% of the capital stock paid in cash, from the date of such organization. It is proper for the court to again refer the matter to the master commissioner to ascertain the facts and strike a balance of accounts according to the plan above formulated, and the court will render judgment for the balance in favor of the one to whom it is due, but appellant is not entitled to further election.

In view of the large credit apparently due him on his purchase and of the fact that no question of his solvency has been raised, we do not think the execution of a bond essential, but the court may provide in its judgment for the payment to appellees of any balance that may be due them on final account before the delivery of the stock and give them a lien thereon for their security.

For the reasons indicated the judgment is reversed and cause remanded for proceedings consistent with this opinion.