## ACTON et ux. v. POINT–O–PURCHASE ADVERTISING CO. et al.

### No. 13094.

Court of Civil Appeals of Texas. Dallas.

July 27, 1940.

Rehearing Denied Oct. 5, 1940.

Touchstone, Wight, Gormley & Touchstone and M. R. Irion, all of Dallas, for appellants.

John H. Bickett, Jr., and J. C. Muse, Jr., both of Dallas, for appellees.

LOONEY, Justice.

This appeal is from an order entered, at the suit of Cain Bagracks Company and Point-O-Purchase Advertising Company (corporations), granting a temporary injunction, restraining Len Acton, appellant, in the respects hereinafter stated.

As the only question presented is whether the trial court abused its discretion in granting the temporary writ, we will make only a limited statement in regard to the nature of the pending litigation between the parties, and the facts giving rise to the lawsuit.

Prior to January 1, 1940, Len Acton and M. K. Davis were engaged in the business of selling certain advertising specialties; operating under two firm names, that is, Cain Bagracks Company and Point-O-Purchase Advertising Company. The advertising matter or commodities dealt in were known as: Bagracks, Four-View Signs, Addoorpulls, Twine Holder, Conditionator, and Taxi-Neon. The Bagrack, used in grocery stores, is a receptacle for sacks and bags of various sizes, held by a mechanical device permitting their withdrawal from the bottom, its metal sides being for the display of advertising matter; the Addoorpull is a handle, displaying advertising matter, placed on screen doors in retail establishments; the other items are imitation Neon signs, a Four-View Sign, and the Conditionator, being a cabinet for the display of bread, and to keep same in a sanitary, merchantable condition.

In the trade-name of Point-O-Purchase Advertising Company, the partners contracted with the F. M. Thorpe Mfg. Company, of Lamar, Mo., to manufacture Bagracks, ship to purchasers on orders sent in, invoice and collect for same, and, after retaining cost of manufacture, the remainder to be held for, or remitted to the firm.

The business pursued by the parties was profitable; during the year 1939, its earnings were sufficiently large to net each partner $15,000, besides $9,000 of uncollected accounts. On January 1, 1940, Acton and Davis caused two corporations to be chartered, bearing the names under which they acted as partners, that is, Cain Bagracks Company and Point-O-Purchase Advertising Company; each with an authorized capital of $1,000, of which $500 was paid in. Acton was president, and Davis, vice president and treasurer, of each corporation; the directors of Cain Bagracks Company were Davis, Acton and Acton's wife; the directors of Point-O-Purchase Advertising Company were Acton, Davis and Davis' wife. The stock in these companies was treated and considered as community property; the wives of the parties taking no active part in the management of the business.

These corporations succeeded, not only to the names under which Acton and Davis operated as partners, but also to all the partnership assets, including contracts on hand, and all rights and interests belonging or pertaining to the business. The method of operating the business was not changed, being handled and conducted as though the partnership was still in existence. The corporations were not competitive; they had the same officers, salesmen, employes, and occupied the same quarters. All sales were credited on books, in such manner as to equally distribute between the corporations, the total business.

On April 15, 1940, the corporations were safely solvent; owned, among other properties, a deposit of $1,800 in the Liberty State Bank of Dallas; a Cadillac automobile, certain credits with Thorpe Mfg. Company, and certain samples, sale kits, etc., used by their salesmen. Prior to the date just mentioned, Acton, becoming dissatisfied, desired to acquire full ownership and control of the business and, with that end in view, had several discussions with Davis and, finally, on April 17, 1940, delivered to Davis, in the form of a letter, a "give or take" proposition, that is, he proposed to either purchase or sell on the terms and conditions stated. The letter is lengthy and need not be reproduced in extenso, but excerpts will be quoted, and the substance otherwise will be stated, as follows; the first paragraph reads: "After having given careful consideration for quite some time to the problem of how to continue the activities of our business in the manner which I believe to be in the best interests for both of us, I am convinced that the following proposal is fair. I consider it also the most practical method of assuring that we both receive some equitable future benefits from the business in proportion to our individual capabilities and activities in the growth and continuance

of the business"; followed by proposing that, an auditor, jointly chosen, should make an audit of the business of the two corporations, showing its status, as of April 15, 1940; that all debts and liabilities of the two corporations, as of that date, should be discharged; that the physical assets should either be partitioned or sold and the proceeds equally divided; that the purchaser should assume the overhead expenses of the two corporations after April 15, 1940; that all remaining moneys, and receivables coming from Thorpe Mfg. Company, on orders taken prior to and including April 15, 1940, should be equally divided; that all orders taken after April 15, 1940, would belong to the corporations; the purchaser agreeing to pay the seller "5% on the gross moneys received from accounts on sales made after April 15, 1940", in consideration of the transfer by the seller to the purchaser, of his 50% stock in the corporations, it being "further understood that for such 5% you are to develop to the ultimate acceptance such items as are now in an incomplete condition and it is further agreed that any new idea, or improvements of those already mentioned which you develop, you are to receive the aforementioned 5% on"; providing further that, no restrictions would be placed upon the future activities of the seller, but that, he would be wholly free to enter into any field of industry, or any type or character of work that he may desire, "whether or not it be in competition with the products of the two corporations".

In form, the letter was a proposition by Acton to purchase from Davis his interest in the business, but stated: "In offering you this proposition I am also willing to accept it for myself." This converted the letter into a give or take proposition, but stipulated that he must have an answer by noon Friday, April 19; and, accordingly, before that date, Davis wrote Acton that: "I will take over the two corporations and all our business and settle with you in exact accord with 'your proposition contained in your letter of April 17, 1940." On receipt of Davis' letter, exercising the option to take over the business, Acton immediately withdrew, ceased all active participation in the management of the business, and agreed with Davis on the person to be employed to audit the affairs of the corporations.

However, appellees complained that, immediately thereafter, Acton launched a business, under the name of "Acton Advertising Associates", for the purpose of selling the identical articles produced and sold by the corporations; sought to appropriate to himself the good will of the business; communicated with salesmen then in the service of appellees, induced them to resign and accept service with Acton Advertising Associates; caused orders previously taken to be withheld by the salesmen, and sample kits belonging to appellees, retained; and immediately began soliciting appellees' customers for sales of said commodities and articles for the account of Acton Advertising Associates; instructed Thorpe Mfg. Company not to pay appellees any funds due on orders taken prior or subsequent to April 15, 1940; induced that Company to cancel the manufacturing contract existing between it and appellees; wrongfully drew from the Liberty State Bank of Dallas $1,800 to the credit of the business, and procured the issuance to himself of two cashier's checks for $900 each, using one in furtherance of his own business and, refused to surrender to appellees the other.

Acton's alleged wrongful conduct provoked the institution, by appellees, of the present proceedings, seeking injunctive relief, which, as before stated, was granted, Acton being temporarily enjoined, as follows:

"(1) From cashing, hypothecating and/or pledging the $900.00 cashier's check on the Liberty State Bank of Dallas, Texas, described in the plaintiffs' petition;

"(2) From withdrawing and/or collecting from F. M. Thorpe Mfg. Company of Lamar, Mo., any moneys or funds belonging to Point-O-Purchase Advertising Company and Cain Bagracks Company, or either of them, and from withdrawing and/or collecting from said Thorpe Mfg. Company any moneys or funds that have accrued or will accrue on orders taken by Len Acton individually or in the name of Acton Advertising Associates since April 19, 1940; except as to any moneys or funds due the said Acton on orders for items other than Bagracks, Four-View Signs, Addoorpulls, Twine Holder, Conditionator, and Taxi-Neon.

"(3) From using the Cadillac automobile, the property of Point-O-Purchase Advertising Company and Cain Bagracks Company, for any purpose whatever except in the furtherance of the business of said Point-O-Purchase Advertising Company and Cain Bagracks Company;

"(4) From appropriating and/or using the samples, sales kits, and other materials owned by Point-O-Purchase Advertising Company and Cain Bagracks Company, except in the furtherance of sales for the use and·benefit of said corporations;

"(5) From soliciting the customers and prospective customers of Point-O-Purchase Advertising Company and Cain Bagracks Company, and from selling, or attempting to sell, bagracks and other products and merchandise belonging to said corporations, other than for the account and use and benefit of said corporations; and

"(6) From representing to the trade and the public that the corporations, Point-O-Purchase Advertising Company and Cain Bagracks Company, are being liquidated and that he and the Acton Advertising Associates are the successor of said corporations."

■ No question is raised as to the right of the corporations to prosecute the suit; nor do we think their right to do so, could be successfully questioned. They were safely solvent; Davis and Acton were sole owners of all stock, therefore, as individuals, were privileged to deal as they chose with the property and property rights of the corporations—of course, not to the prejudice of creditors. See Dysart v. Flemister, Tex.Civ.App., 140 S.W.2d 350, 353.

Appellant contends that the trial court erred in granting the temporary injunction, because the agreement between the parties contained no provision forbidding him to compete with appellees in the sale of the advertising specialties mentioned.

■ The agreement heretofore set out, after providing for an equal distribution of the physical assets of the corporations, contained provisions clearly indicating that the business, as theretofore conducted, would be continued; stating in effect that the plan of dissolution suggested would continue the business to the best interest of both, under which each would receive future benefits; the purchaser agreeing to pay the seller 5% of gross moneys received from sales after April 15, 1940, in consideration of the seller transferring all stock owned by him in the corporations to the purchaser; specifically stating that the business to be continued in the future was to be the same as before, that is, the sale of Bagracks, Four-View Signs, Addoorpulls, Twine Holder, Conditionator, and Taxi-Neon.

The transfer by appellant of all his stock represented his entire interest in the business, including its good will, hence we think the implication inescapable that, he could do nothing in derogation of the business, or interfere with its future successful operation, without violating the spirit, purpose and intent of the agreement.

The facts involved in Red Top Cab Co. v. Hanchett, D.C., 48 F.2d 236, 238, are strikingly similar to the facts here involved. In that case, the court used the following pertinent language: "The evidence in the present case leaves no room for doubt that defendant, in organizing his competing business, knowingly crippled and injured the plaintiff company, depriving it of selected personnel and using its facilities in the launching of his own project. Plaintiff is entitled to a decree, and in ordering such decree I believe that elective provisions should be made therein." The cases of Jones v. Campbell-Taggart Associated Bakeries, 5 Cir., 63 F.2d 58, and Coleman v. Hanger, 210 Ky. 309, 275 S.W. 784, by the Supreme Court of Kentucky, also are in point.

We find nothing in the contract forbidding appellant to engage in an enterprise of the same general nature as that pursued by appellees; in fact, that right seemingly is expressly recognized; but we do think that he is forbidden to engage in the business of selling the identical products, dealt in by appellees, upon which the business was established and its future depends.

In view of the evidence, we cannot say that the court abused its discretion in resolving all issues of fact in favor of appellees, or in holding, as evidently it did, that the agreement prohibits appellant from competing with appellees in the sale of the advertising specialties named, or from doing any of the things he was forbidden to do.

It follows that, in our opinion, the court did not abuse its discretion in granting the temporary writ, hence its judgment is affirmed.

Affirmed.