

# Fourth Court of Appeals
## San Antonio, Texas

### DISSENTING OPINION

No. 04-12-00630-CV

**THE HUFF ENERGY FUND, L.P.**, WRH Energy Partners, L.L.C., William R. "Bill" Huff,
Rick D'Angelo, and Riley-Huff Energy Group, LLC,
Appellants

v.

**LONGVIEW ENERGY COMPANY**,
Appellee

From the 365th Judicial District Court, Zavala County, Texas
Trial Court No. 11-09-12583-ZCVAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by: Sandee Bryan Marion, Chief Justice
Concurring Opinion by: Marialyn Barnard, Justice
Dissenting opinion by: Luz Elena D. Chapa, Justice, joined by Rebeca C. Martinez, Justice
Concurring and Dissenting Opinion by: Patricia O. Alvarez, Justice

Sitting en banc:  Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Jason Pulliam, Justice

Delivered and Filed:  November 25, 2015

Longview Energy Corporation's live pleadings gave fair notice that a basic issue to be resolved at trial was whether Bill Huff and Rick D'Angelo engaged in competition with Longview by forming and operating Riley-Huff Energy Group without the informed approval of Longview's board of directors. In addressing the corporate opportunity issues, the majority and concurrence

also misapply the applicable standard of review and re-define and narrow the scope of Delaware's corporate opportunity doctrine. Although the record clearly establishes the liability of Huff, D'Angelo, and Riley-Huff, I would hold the trial court abused its discretion by disregarding Riley-Huff's development costs and not limiting the constructive trust to the profits or benefits Riley-Huff obtained as a result of Huff and D'Angelo's breach of fiduciary duty. Because I would reverse and remand the case to the trial court for further proceedings regarding the proper remedy, I respectfully dissent.

# I
## FACTUAL BACKGROUND & PROCEDURAL HISTORY

Longview is an oil and gas company organized under the laws of Delaware and headquartered in Dallas, Texas. In 2006, Huff Energy Fund (HEF), a firm that invests in several portfolio companies, invested in Longview and negotiated the right to seat two directors on Longview's board of directors. HEF selected Bill Huff and Rick D'Angelo, one of Huff's associates, to serve on Longview's board. By investing an additional $20 million in Longview, HEF became a 39-40% shareholder of the company.

In September 2009, members of Longview's executive management team met with Huff and D'Angelo to discuss opportunities for leasing acreage in an area known as the Eagle Ford. The Eagle Ford is an oil reserve in Texas that spans nearly thirteen million acres, where the market for leasing acreage to develop oil and gas assets at that time was becoming highly competitive. Huff and D'Angelo requested that Longview begin investigating Eagle Ford opportunities, and Huff told Longview that if it located an investment in the Eagle Ford that Longview liked, he would fund it.

Researching Eagle Ford opportunities and positioning itself to invest in the Eagle Ford for purposes of growth and financial prosperity became Longview's top priority over the next several

months. Longview hired Mark Lober, a geologist and geophysicist, to analyze public data on the Eagle Ford and to discuss the "word on the street" with brokers. Lober analyzed seismic data, isopach (thickness) maps, well logs, geochemical information, pipeline infrastructure, existing wellbores, available acreage, and the activities of competitors in the area. Longview's management team also spent two-thirds to three-quarters of its time investigating Eagle Ford opportunities. Longview provided Lober's analyses to D'Angelo, who encouraged Longview to proceed with pursuing opportunities in the Eagle Ford.

Lober introduced Longview to Pat Gooden and Tamara Ford, brokers who were leasing acreage in the Eagle Ford. Gooden and Ford informed Longview that over 200,000 acres were available for leasing and provided Longview with "blob maps" showing areas for lease, the acreage available, general pricing information, and other information. Longview initially contemplated leasing approximately 40,000 acres in eleven counties for roughly $1,000 per acre.

Longview provided D'Angelo with the information it received and updates on its progress, and D'Angelo continued to express his enthusiasm about Longview's prospective investment opportunity. Longview made several attempts to contact Huff (who was the ultimate decision maker regarding HEF's financing of Longview's investment in the Eagle Ford), but was unable to meet with him because Huff was on vacation or otherwise unavailable.

Members of Longview's management team continued to meet with Ford, Gooden, and D'Angelo in December 2009 and January 2010. At a December 17, 2009 meeting, Lober presented his analyses, economic plans for how Longview could develop the acreage, and other information he received from Gooden and Ford. On December 21, 2009, Longview met again with Gooden and Ford, who relayed that Chesapeake, a major oil company, had purchased a significant amount of acreage that was under Longview's consideration. At that meeting, D'Angelo participated by phone and agreed that Longview was "absolutely ready" to go forward with an investment in the

Eagle Ford. Longview sent D'Angelo the additional information it received from the brokers during the meeting. On January 13, 2010, Longview's management team discussed with D'Angelo a proposal to lease about 21,000 acres for approximately $40 million. Longview's strategy was to lease acreage, "prove up" the acreage, and then sell or assign the leases at a profit. The proposal was submitted to the directors as a way to increase the value of the shares for the benefit of Longview's shareholders.

Concerned about Huff's unavailability, Longview scheduled a board meeting for January 28, 2010, to consider the proposal. At the board meeting, D'Angelo informed Longview that Huff would not fund any investment in the Eagle Ford. Longview's board did not vote on the proposal at that meeting, but it considered other options for financing an Eagle Ford investment and investments in other areas. Because the price per acre in the Eagle Ford was soaring, Longview believed it had lost the opportunity to obtain a ground-floor acreage position in the Eagle Ford. Longview did not thereafter lease any Eagle Ford acreage.

Longview later discovered that in October 2009, Huff had formed Riley-Huff Energy Group, a Texas limited liability company with its headquarters in Oklahoma. Riley-Huff is also an oil and gas company that sought to acquire, develop, and sell assets in the Eagle Ford. Longview learned HEF was the limited partner and a 99% shareholder of Riley-Huff and D'Angelo had been serving as one of its managers since Riley-Huff's inception. Huff and D'Angelo never disclosed either of those facts to Longview, nor did they seek Longview's board's approval before forming and operating Riley-Huff.

Longview also discovered that after it notified D'Angelo about opportunities to lease acreage through Ford, Riley-Huff was in discussions with Ford about leasing Eagle Ford acreage. When Ford asked Riley-Huff about its relationship with Longview regarding leasing acreage in Eagle Ford, she was informed Riley-Huff's relationship with Longview was "arms-length and

competitive." Riley-Huff hired Jim Doherty to research and analyze some of the same types of information, specifically well logs and an isopach map, that Lober was researching and analyzing. After D'Angelo received the research and analyses from Doherty and Lober, HEF decided to fund only Riley-Huff's acreage play in the Eagle Ford.

Longview further discovered that three days before the January 28, 2010 board meeting, Riley-Huff signed a letter of intent with Ford to lease a significant amount of Eagle Ford acreage. Throughout 2010 and into 2011, Riley-Huff continued to lease additional acreage and develop its assets in the Eagle Ford. Riley-Huff determined its value had increased from about $32.3 million at the end of 2009 to more than $478 million by the end of 2010.

Longview filed suit against Huff, D'Angelo, HEF, WRH Energy Group LLC (HEF's general partner), Riley-Huff, and other defendants. The case proceeded to trial, and the jury found Huff and D'Angelo breached their fiduciary duties of loyalty to Longview by usurping a corporate opportunity and by competing with Longview without the informed approval of Longview's board of directors. The jury also found HEF and Riley-Huff liable for knowingly participating in Huff and D'Angelo's breach. The jury found that as a result of Huff and D'Angelo's breach, Riley-Huff acquired assets in the Eagle Ford. The jury answered four other questions about the market value, acquisition costs, past production revenues, and development costs related to Riley-Huff's Eagle Ford assets.

The trial court rendered judgment in Longview's favor. The trial court granted Longview an equitable interest in, and a constructive trust over, all right, title, and interest of Riley-Huff in and to specified assets, including production revenues. The trial court also awarded Longview an additional $95.5 million. Huff, D'Angelo, HEF, WRH Energy, and Riley-Huff (Appellants) filed this appeal.

## II
### APPLICABLE LAW

The parties agree Delaware law applies to liability and remedy issues and Texas law governs procedural issues, which include issues of evidence, burdens of proof, pleadings, and standards of review. *See Robin v. Entergy Gulf States, Inc.*, 91 S.W.3d 883, 886 (Tex. App.—Beaumont 2002, pet. denied) (applying Louisiana substantive law and Texas procedural law, including the standard of appellate review); *see also Tex. Dep't of Corr. v. Herring*, 513 S.W.2d 6, 7-8 (Tex. 1974) (describing rules regarding evidence, burden of proof, pleadings, and motions as procedural). I apply the law according to the parties' agreement. *See Helmerich & Payne Int'l Drilling Co. v. BOPCO, L.P.*, 357 S.W.3d 801, 805 (Tex. App.—Eastland 2011, no pet.); *Brown v. Pennzoil-Quaker State Co.*, 175 S.W.3d 431, 435 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When applying Delaware law, I first look for an authoritative decision from the Supreme Court of Delaware and if none is available, I give due deference to decisions by Delaware's lower courts and, if necessary, other authorities. *See Highland Crusader Offshore Partners, L.P. v. Andrews & Kurth, L.L.P.*, 248 S.W.3d 887, 890 n.4 (Tex. App.—Dallas 2008, no pet.).

## III
### USURPATION OF A CORPORATE OPPORTUNITY

The majority's and concurrence's analyses of Appellants' corporate opportunity issues misapply both the standard of review under Texas law and substantive Delaware law regarding liability for usurping a corporate opportunity. The majority and concurrence do not measure the legal sufficiency of the evidence against the charge as given. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).[1] Appellants' only challenge to liability based on usurping a

---

[1] During the charge conference, Appellants objected to the submission of Question No. 1 based on its wording of (1) the specificity of the corporate opportunity; (2) expectancy or actual interest; and (3) rejection of the corporate opportunity. However, Appellants did not object to the absence of legal definitions or tender substantially correct legal

corporate opportunity is, expressly, "There Is Legally Insufficient Evidence *to Support the Jury's Answer to Question 1*." (emphasis added). Although Appellants' briefs do not designate any issue or contain any argument as to the denial of their motion for directed verdict, the majority and concurrence measure the legal sufficiency of the evidence against a hypothetical jury charge under Delaware law, as demonstrated by the majority's and concurrence's references to and analyses of legal definitions and principles contained in Delaware case law. The jury was instructed that if a word was used in the charge in a way that was different from its ordinary meaning, the trial court would provide a correct legal definition. Because the charge did not define corporate opportunity, expectancy interest, or financial ability, the majority and concurrence err by measuring the legal sufficiency of the evidence against legal definitions not delineated or contained in the charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Kroger Co. v. Brown*, 267 S.W.3d 320, 322-23 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Moreover, our standard of review requires that we view all the evidence in Longview's favor and also assume the jury made credibility determinations in Longview's favor, but the majority and concurrence both disregard evidence favorable to Longview. *See City of Keller v. Wilson*, 168 S.W.3d 802, 820, 823 (Tex. 2005). The majority disregards significant evidence favorable to Longview in concluding there was no evidence that Huff and D'Angelo's purchase of Eagle Ford leases "hindered or defeated Longview's plan to also acquire acreage in the Eagle Ford." First, there was evidence that Huff did not fund Longview's resource play in the Eagle Ford because Huff funded Riley-Huff's resource play. Thus, Huff's leasing Eagle Ford acreage through Riley-Huff directly hindered Longview's potential and defeated its plans to lease Eagle Ford acreage. Second, as Appellants admit, many of the acres leased by Riley-Huff were in the areas

definitions of the terms "specific corporate opportunity," "expectancy interest," or "financial ability." *See* TEX. R. CIV. P. 274, 278.

being considered by Longview and were leased through brokers with whom Longview was also in negotiations. Third, there was evidence that by diminishing the supply of acreage in a high-demand market, Riley-Huff's purchase of Eagle Ford leases contributed to the soaring cost to lease Eagle Ford acreage that ultimately priced Longview out of a worthwhile investment in the Eagle Ford. The concurrence also makes credibility determinations and draws inferences unfavorable to Longview when analyzing the jury's implied finding on financial ability and disregards evidence that Huff and D'Angelo's breach was the sole reason why Longview's board rejected the corporate opportunity.

The majority and concurrence also misapply Delaware law. The majority's reliance on *Johnston v. Greene*, 121 A.2d 919 (Del. 1956), and *Colorado & Utah Coal Co. v. Harris*, 49 P.2d 429 (Colo. 1935), is misplaced. This case does not present the situation contemplated by *Johnston* when the corporation is attempting to claim "any and every business opportunity" brought to the director in the director's individual capacity. *See Johnston*, 121 A.2d at 923-24. This case presents a much narrower scope of opportunities in which the corporation has an expectancy interest: only those opportunities a director induces the corporation to pursue. Also, *Colorado & Utah Coal Co.* is distinguishable in a key respect. There, the court addressed whether the evidence was sufficient to support a finding that there was *not* an expectancy interest in a corporate opportunity. *See Colo. & Utah Coal*, 49 P.2d at 430-31. Some evidence that could support a finding that there is no expectancy interest in a corporate opportunity does not necessarily conclusively establish the absence of an expectancy interest. The concurrence cites no Delaware case holding there was no corporate opportunity because the supposed business opportunity was not specific enough. Rather, under Delaware law, a corporate opportunity can include a group of varying business opportunities. *See, e.g.*, *Dweck v. Nasser*, No. 1353-VCL, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012); *McGowan v. Ferro*, 859 A.2d 1012, 1026, 1039-40 (Del. Ch. 2004). I, therefore, decline

to adopt a hypothetical or theoretical approach in determining the corporate opportunity issues. Even if I were to agree with either or both opinions, I would nevertheless affirm liability based on the jury's answers to Question No. 2 regarding competition.

## IV
### COMPETITION

I respectfully disagree with the majority's conclusion that Longview did not give fair notice of its competition claim. The majority mints a new "theme"-based standard of construing pleadings and holds that when a party pleads facts constituting two similar, yet distinct causes of action, but pleads more facts in support of one than the other, no fair notice is given of the less prominently pled cause of action. Although Appellants waived all complaints about defects and obscurities in Longview's pleading by not filing special exceptions, the majority recasts pleading defects and obscurities as reasons why Longview may not prevail on its competition claim. For the past 170 years, Texas has sought to eliminate such technicalities from its pleading standard. And, because the record confirms Appellants were informed and aware of Longview's intent to prove a breach of fiduciary duty of loyalty by competition, the trial court followed well-established Texas law and properly construed Longview's pleadings liberally in Longview's favor and so as to do substantial justice. By overruling Appellants' objection to the competition question in the jury charge, the trial court declined to reward Appellants for delaying until the charge conference to first complain about technical defects that, because of their failure to specially except, Longview had no opportunity or reason to correct. The majority's holding that a competition cause of action could not be reasonably inferred from Longview's live pleadings disregards our state's pleading standard.

### A. *Appellants' Proposed Heightened Pleading Standard*

Huff and D'Angelo's issue on appeal, which the other Appellants adopted and which the majority sustains, is that "Longview failed to plead a separate claim for competition." Appellants initially argued that Longview did not plead a competition claim because it failed to expressly plead the legal theory of "breach by competition" separate from usurpation in the Claims section of its live pleading. In post-en banc submission briefing, Appellants add that even if Longview's entire live pleading is considered, the pleading is defective and ambiguous as to whether Longview was raising a competition claim. Although the majority adopts only the latter reasoning, an analysis of Appellants' initial argument helps to understand why both bases for Appellants' issue lack merit.

In arguing Longview did not plead the legal theory of "breach by competition" separate from "breach by usurpation" because competition was not clearly pled in the Claims section, Appellants incorrectly assume a party must expressly identify all of its legal theories of recovery in a particular part of its pleading. Alternatively understood, Appellants' argument is that when a party voluntarily pleads some legal theories of recovery, the party is not entitled to recover on any legal theory not expressly identified—even when, as is the case here, the petition affirmatively alleges facts supporting an additional legal theory and the opposing party does not specially except. Either way, Appellants have suggested that this court adopt a heightened pleading standard that is not supported by the plain language and purposes of the Texas Rules of Civil Procedure; contrary to Texas's more-than-a-century-old fair-notice pleading standard; and out of step with the notice-pleading standard other jurisdictions apply.

#### 1. *A party need not expressly plead legal theories of recovery to give fair notice.*

The plain meaning of the Texas Rules of Civil Procedure neither expressly requires nor supports a requirement that parties expressly identify their legal theories of recovery in their

pleadings. Under Rule 45, all pleadings in district court must "consist of a statement in plain and concise language of the plaintiff's cause of action. . . . That an allegation be evidentiary or be of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations *as a whole*." TEX. R. CIV. P. 45(b) (emphasis added). Rule 47 provides, "An original pleading which sets forth a claim for relief . . . shall contain . . . a short statement of the cause of action sufficient to give fair notice of the claim involved." TEX. R. CIV. P. 47(a). Rules 45 and 47 use the undefined terms "claim" and "cause of action." A "claim" is "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." BLACK'S LAW DICTIONARY 264 (8th ed. 2004) ("claim"). Therefore, a pleading that sets forth a demand for money, property, or other legal remedy must contain a short statement of "the cause of action." *See* TEX. R. CIV. P. 45, 47.

A "cause of action" can be defined either as "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person," or "[a] legal theory of a lawsuit." BLACK'S LAW DICTIONARY 235 (8th ed. 2004) ("cause of action"). As the Supreme Court of Texas has noted, "[T]he generally accepted meaning of ['cause of action'] refers to the 'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'" *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012) (quoting *In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008); *A.H. Belo Corp. v. Blanton*, 133 Tex. 391, 129 S.W.2d 619, 621 (1939)); *see* Charles E. Clark, *The Complaint in Code Pleading*, 35 YALE L.J. 259, 289 (1926) (explaining "cause of action" in pleading rules refers to the "facts giving ground for societal action through the courts"). Furthermore, Rule 45 provides that alleging legal conclusions is not objectionable when the allegations as a whole provide fair notice. TEX. R. CIV. P. 45(b). If Rules 45 and 47 are construed to require allegations of legal conclusions supporting "a legal theory of a lawsuit," then Rule 45's provision permitting the

pleading of legal conclusions would be surplusage. *See In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 437 (Tex. 2007) (applying statutory rules of construction when construing rules of civil procedure); *Tex. Dep't of Pub. Safety v. Deakyne*, 371 S.W.3d 303, 307 (Tex. App.—San Antonio 2012, pet. denied) (citing *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000), for proposition that courts should avoid constructions that make statutory language surplusage).

Under the plain meaning of Rules 45 and 47, a pleading states a "cause of action" if it alleges a factual situation that entitles the pleader to obtain a requested legal remedy. *See* TEX. R. CIV. P. 45, 47; *see also Loaisiga*, 379 S.W.3d at 255; BLACK'S LAW DICTIONARY at 234, 264.[2] Rules 45 and 47 do not require a party to expressly identify its legal theories of recovery, although such legal theories are not necessarily objectionable under Rule 45. TEX. R. CIV. P. 45, 47; *accord Ferguson v. Tanner Dev. Co.*, 541 S.W.2d 483, 492 (Tex. Civ. App.—Houston [1st Dist.] 1976) ("A plaintiff is not required to plead his legal theory for recovery if he pleads facts sufficient to support a recovery. It is the duty of the trial court to determine the law and apply it to the facts presented.") (citing *Behan v. Ghio*, 75 Tex. 87, 12 S.W. 996 (1889)), *rev'd on other grounds*, 561 S.W.2d 777 (Tex. 1977).

The heightened pleading standard advocated by Appellants is also inconsistent with the purpose of Rules 45 and 47. The Supreme Court of Texas has explained Rules 45 and 47 require fair notice "such that the opposing party can prepare a defense." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (citing TEX. R. CIV. P. 45, 47). The ability to prepare a defense entails being informed of "the nature and basic issues of the controversy and what testimony will be relevant."

---

[2] Rule 50, which governs how allegations should be stated and how some of the required contents of a pleading should be organized, does not require a pleading to expressly identify any legal theories or make legal arguments. *See* TEX. R. CIV. P. 50.

*Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). Courts applying Texas's fair-notice pleading standard must review the allegations as a whole (which necessarily includes all factual allegations) to determine whether a pleading gives fair notice. TEX. R. CIV. P. 45; *Paramount Pipe & Supply Co. v. Muhr*, 749 S.W.2d 491, 495 (Tex. 1988); *Ware v. Crystal City Indep. Sch. Dist.*, 489 S.W.2d 190, 191 (Tex. Civ. App.—San Antonio 1972, writ dism'd) (per curiam). Ultimately, as the Supreme Court of Texas has explained, "[a] petition is sufficient if it gives fair and adequate notice of the *facts* upon which the pleader bases his claim." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982) (emphasis added).

Texas has long rejected pleading rules, such as a requirement that legal theories of recovery be clearly and accurately identified, that prioritize form over substance. "In common-law pleading, 'issue pleading' was the norm. . . . It developed over the course of centuries into a highly technical exchange of written instruments . . . having as their 'great object' the reduction of the dispute to a single issue." 2 ROY MCDONALD & ELAINE E. GRAFTON CARLSON, TEXAS CIVIL PRACTICE § 7:2, at 177 (2002 ed.). "[T]he common law system of pleadings was never used in Texas courts." William V. Dorsaneo, III, *The History of Texas Civil Procedure*, 65 BAYLOR L. REV. 713, 717 (2013). Instead, Texas adopted "fact pleading," an equitable pleading system that required a statement of "the factual basis of the dispute rather than a technically precise selection of legal theories." 2 MCDONALD & CARLSON, § 7:2, at 178; *see* Dorsaneo, 65 BAYLOR L. REV. at 717; *see also Gunnells Sand Co. v. Wilhite*, 389 S.W.2d 596, 597-98 (Tex. Civ. App.—Waco 1965, writ ref'd n.r.e.) ("Texas early rejected the English system of pleading and adopted that of the Roman, or civil law as modified by Spanish and Mexican practice."). Under Texas's former fact-pleading standard, the rules "required that pleading[s] state 'facts, in contradistinction to a statement of evidence, of legal conclusions, and of arguments.'" 2 MCDONALD & CARLSON, § 7:2, at 179 (quoting former Texas Rule of Civil Procedure 2).

Texas's fact-pleading standard stood in contrast to those of jurisdictions that followed the "theory of the pleadings" doctrine, which was a "'rule of pleading that a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all.'" *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1219 (3d ed. 2002) (quoting *Mescall v. Tully*, 91 Ind. 96, 99 (1883)). "In many ways the 'theory of the pleadings' doctrine seems to represent little more than a reversion to the pleading philosophy of the common law forms of action in a new guise and therefore [is] subject to many of the objections leveled at the common law system." *Id.* One such objection was that common-law pleading resulted in "dismissals based on technical deficiencies." *Id.* § 1374. The vast majority of jurisdictions in the United States have abolished the "theory of the pleadings" doctrine in favor of notice pleading or fact pleading, and do not require a party to expressly identify legal theories of recovery in the pleading stage.[3]

But even under Texas's former fact-pleading standard, the requirement that pleadings contain statements of facts and not legal conclusions or arguments became overly technical. "By 1925, it could be declared that 'into these simple rules . . . has been injected by the courts a mass of technicalities that confound the oldest practitioner, . . . . A critical reexamination of the

---

[3] Federal Rule of Civil Procedure 8(a) requires a statement of the grounds of jurisdiction, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for the relief sought. FED. R. CIV. P. 8(a). Similarly, Texas's rules require only a short statement of a cause of action, a statement of jurisdiction, a range of monetary relief, and a demand for all other relief to which the party may be entitled. TEX. R. CIV. P. 47. Federal Rule of Civil Procedure 8(a), and the states that have adopted rules nearly identical to Rule 8(a), do not require parties to expressly plead legal theories of recovery. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) (per curiam); *see, e.g.*, *Atlanta Newspapers, Inc. v. Shaw*, 182 S.E.2d 683, 685 (Ga. 1971); *Shields v. Taylor*, 976 N.E.2d 1237, 1244 (Ind. Ct. App. 2012); *Golden v. Den-Mat Corp.*, 276 P.3d 773, 784 (Kan. Ct. App. 2012); *Whitinsville Plaza, Inc. v. Kotseas*, 390 N.E.2d 243, 245 (Mass. 1979); *State ex rel. B.M. v. Brian F.*, 846 N.W.2d 257, 267 (Neb. 2014); *Illinois Controls, Inc. v. Langham*, 639 N.E.2d 771, 782 (Oh. 1994); *Haley v. Town of Lincoln*, 611 A.2d 845, 848 (R.I.1992). Fact-pleading jurisdictions and notice-pleading jurisdictions that do not have rules modeled on Rule 8(a) also do not require a party to plead legal theories of recovery. *See, e.g.*, *Roush v. Mahaska State Bank*, 605 N.W.2d 6, 9 (Iowa 2000); *Parish of Jefferson v. Bankers Ins. Co.*, 88 So.3d 1082, 1085 (La. Ct. App. 5 Cir. 2012, writ denied); *Goodley v. Folino*, No. 2376 C.D. 2010, 2011 WL 10858491, at *4 (Pa. Commw. Ct. July 22, 2011).

requirement of 'fact' pleading was an important aspect of the procedural reforms during the 1930s and 1940s." 2 MCDONALD & CARLSON, § 7:2, at 180 (quoting Thomas H. Franklin, *Simplicity in Procedure*, 4 TEX. L. REV. 83, 94 (1925)). In 1941, Texas Rules of Civil Procedure 45 and 47 were adopted, and Rule 45 provides, "That an allegation be . . . of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations as a whole." TEX. R. CIV. P. 45(b). "Rule 45 shifts the emphasis from the inherently unworkable metaphysical distinction [between facts and conclusions of law] to a thoroughly practical test of whether the pleading gives adequate notice." 2 MCDONALD & CARLSON, § 7:4, at 189.

Like other jurisdictions' pleading rules, Rules 45 and 47 do not "countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) (per curiam); *see* TEX. R. CIV. P. 45, 47. Under the overall scheme of the Texas Rules of Civil Procedure, the identification and narrowing of the legal theories raised by the pleadings is a function of discovery and summary judgment. *See, e.g.*, TEX. R. CIV. P. 194.2(c) ("A party may request disclosure of . . . the legal theories and, in general, the factual bases of the responding party's claims or defenses."); TEX. R. CIV. P. 197.1 ("An interrogatory may inquire whether a party makes a specific legal or factual contention and may ask the responding party to state the legal theories and to describe in general the factual bases for the party's claims or defenses."); *see also* 2 MCDONALD & CARLSON, § 7:2, at 180 ("'[T]he modern remedies of discovery . . . and summary judgment . . . are geared to the prompt disclosure of all facts and matters in dispute.'") (quoting Charles E. Clark, *Simplified Pleading*, 27 IOWA L. REV. 272 (1942)). Thus, parties are not required to expressly plead legal theories of recovery to give fair notice. And in determining whether a party received fair notice, we must consider the allegations as a whole and not simply scrutinize one particular section of a pleading.

### 2. *Voluntarily pleading some legal theories does not alter the fair-notice pleading standard or necessarily waive legal theories not expressly pled.*

The alternative understanding of Appellants' position is that when a party voluntarily identifies some legal theories of recovery in its pleading, the party may not recover on any legal theory not expressly pled—even when the pleading expressly alleges facts supporting an additional theory of recovery and the opposing party does not specially except. As a variant of a requirement that a party must plead legal theories, Appellants' position lacks support in the plain meaning and purposes of Rules 45 and 47 and, by virtue thereof, is not informed by the historical development of those rules. Appellants cite no well-reasoned authority supporting the proposition that by voluntarily identifying some legal theories of recovery in a pleading, a party alters the fair-notice pleading standard or imposes upon itself a heightened pleading standard. Such a proposition is precluded by the plain language of Rule 45, the liberal construction rule, and decisions of the Supreme Court of Texas.

The plain language of Rule 45 requires courts to consider the "allegations as a whole" when determining whether a pleading gives fair notice. TEX. R. CIV. P. 45(b). A requirement that trial courts consider only the legal theories identified in one section of a petition is directly contrary to Rule 45's plain language and defeats its purpose. *See id.* When a party includes some legal theories of recovery in a pleading and alleges facts supporting other legal theories, the omission of the other legal theories can create a misleading ambiguity. *City of Houston v. Howard*, 786 S.W.2d 391, 393 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (citing 2 MCDONALD, TEXAS CIVIL PRACTICE, at 14-16 (1970)). Special exceptions must be filed to force clarification and specification in the pleadings when they are not clear or sufficiently specific. *Hefley v. Sentry Ins. Co.*, 131 S.W.3d 63, 65 (Tex. App.—San Antonio 2003, pet. denied); *see Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 187 (Tex. 1977); *Howard*, 786 S.W.2d at 393.

If an opposing party chooses not to specially except and identify such an ambiguity or obscurity in a pleading, the pleader is given "no opportunity to correct it." *Horizon/CMS*, 34 S.W.3d at 897. Thus, "[w]hen a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader." *Id.*; *see Howard*, 786 S.W.2d at 393 (construing pleading, in absence of special exceptions, as raising legal theories not expressly pled but supported by alleged facts). In liberally construing the pleadings, "[a] court should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged." *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993).

Construing the express identification of some legal theories of recovery as an implied exclusion or disavowal of omitted legal theories is to apply the doctrine of *expressio unius est exclusio alterius*, an inherently restrictive rule of contract and statutory construction. *See Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 24-25 (Tex. 2014); *Mid-Century Ins. Co. of Tex. v. Kidd*, 997 S.W.2d 265, 274 (Tex. 1999). Because the Supreme Court of Texas has held that in the absence of special exceptions, a pleading must be liberally construed in favor of the pleader, courts should not deploy rules of statutory or contract construction to narrowly construe a pleading and make "refined inferences against the pleader." *See De Loach v. Crowley's, Inc.*, 128 F.2d 378, 380 (5th Cir. 1942) (interpreting the rule that pleading should be "construed so as to do substantial justice" in an identically phrased provision in Federal Rule of Civil Procedure 8(e)); *Horizon/CMS*, 34 S.W.3d at 897; 2 MCDONALD & CARLSON, § 7:2, at 189-91.

The Supreme Court of Texas has held that in the absence of special exceptions, a party may prevail on a legal theory supported by the factual allegations in a pleading even if the legal theory was omitted from a list of other expressly pled legal theories. In *Hammer v. Dallas Transit Co.*, the supreme court reversed the court of appeals that held:

plaintiff did not sufficiently plead that defendant was negligent in being across the center of the road. Plaintiff generally described the nature of the accident and in doing so stated that defendant's bus crashed into plaintiff's car "when said bus crossed the center dividing strip on said street." In a subsequent paragraph of the pleading, plaintiff stated several specific acts and omissions of negligence without repeating that the bus was across the center of the road. Defendant urged no exceptions to the pleadings.

400 S.W.2d 885, 889 (Tex. 1966). The supreme court disagreed, holding "We can not say that defendant was surprised or did not have fair notice of plaintiff's theory of the case." *Id.* And in *Southwestern Bell Telephone Co. v. Garza*, the supreme court held the plaintiff gave fair notice of a discrimination claim even though the plaintiff expressly pled his claim as one for retaliation. 164 S.W.3d 607, 616-17 (Tex. 2004). The court analyzed the issue as follows:

> SWBT argues that Garza pleaded only unlawful discharge, not discrimination. . . . But Garza also pleaded that "[i]n retaliation for filing" a compensation claim, he was "ordered to find a non-driving position" and was thereby "effectively disqualified from his job." He sought damages for "retaliatory discharge under the Texas Workers' Compensation Act and wrongful conduct" of SWBT. While Garza's pleadings did not use the word 'discrimination,' they were nevertheless sufficient to raise that charge if they gave fair notice of the facts on which Garza based his action sufficient to allow SWBT to anticipate what evidence would be relevant and to prepare its defense. We think Garza's pleadings clearly met this standard. Had SWBT been in doubt about Garza's claims, it could have sought clarification through special exceptions. It did not do so.

*Id.* Appellants' position, and the majority's suggestion, that Longview waived a competition claim by not specifically listing competition as a separate breach of fiduciary duty in the Claims section of its pleading is foreclosed by the supreme court's holdings in *Hammer* and *Garza*.

## B. *Texas's Fair-Notice Pleading Standard & the Liberal Construction Rule*

The majority misapplies Texas's fair-notice pleading standard and the liberal construction rule. It also recasts pleading defects and obscurities, to which Appellants chose not to specially except, as reasons why Appellants lacked fair notice. As a result, the majority reaches an incorrect conclusion as to whether, with regard to competition, Longview pled a factual basis entitling it to

relief under Delaware law, and thus gave fair notice of a competition claim. I decline to abandon Texas courts' long-standing and well-established applications of these two rules.

### 1. The majority incorrectly holds that pleading a cause of action fails to give fair notice if more facts are alleged in support of another cause of action.

The majority reasons that because most of Longview's factual allegations are thematically related to usurpation of a corporate opportunity, the trial court erred by considering Longview's express allegations that Huff and D'Angelo formed and operated a direct competitor without Longview's knowledge or approval. The majority assumes without any authority that "competition" and "usurpation" are coterminous breaches of fiduciary duty or that if a plaintiff pleads more facts and legal arguments in support of one than the other, the plaintiff has not pled the other. But under Delaware law, a corporate director may be held liable for breaching his fiduciary duty if he usurps a corporate opportunity and/or engages in unapproved competition through a competing company. Pleading more facts in support of one of these two breaches does not per se preclude a party from pleading the other.

Under Delaware law, there are three elements of a corporate breach of fiduciary duty cause of action: (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) resulting injury or unjust enrichment. *See Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).[4] A director's acts of

---

[4] Huff and D'Angelo argue a "competitive injury" is necessary to show a breach. However, "'the absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position.'" *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993) (quoting *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991)), *disapproved of on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1038 (Del. 2004); *cf. Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. 1949) ("In equity, when the breach of a confidential relation by an employee is relied on and an accounting for any resulting profits is sought, loss to the corporation need not be charged in the complaint."). Huff and D'Angelo misplace their reliance on *Thorpe ex rel. Castleman v. CERBCO, Inc*. In *Thorpe*, the Supreme Court of Delaware explained "[t]he strict imposition of penalties under Delaware law are designed to discourage disloyalty." 676 A.2d at 445. "'The rule . . . ***does not*** rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy . . . of . . . extinguish[ing] all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.'" *Id.* (quoting *Guth*, 5 A.2d at 510) (emphasis added). The court in *Thorpe* then held the lower court erred by not disgorging benefits derived from a breach of fiduciary duty even though the lower court found the directors' breach "caused no injury to [the corporation]." *Id.* at 437, 445.

usurping a corporate opportunity and forming and operating a competing company are two distinct methods of breaching the fiduciary duty of loyalty. *See Sci Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 961, 964 (Del. 1980) (analyzing whether employees' preparation to compete breached fiduciary duty although corporation had "abandoned its corporate opportunity thesis"); *Brown v. Fenimore*, No. 4097, 1977 WL 2566, at *5-6 (Del. Ch. Jan. 11, 1977) (holding corporate officer forming and operating competing towing company was a breach of fiduciary duty similar to a usurpation of a corporate opportunity); *Craig v. Graphic Arts Studio, Inc.*, 166 A.2d 444, 445-46 (Del. Ch. 1960) (holding, without discussion of the corporate opportunity doctrine, that forming and operating a competing graphic design company was a breach of fiduciary duty); *see also Thorpe ex rel. Castleman v. CERBCO, Inc*, 676 A.2d 436, 442 (Del. 1996) (noting "[t]he fundamental proposition that directors *may not* compete with the corporation") (emphasis added); 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DEL. LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 4.16 (3d ed. 2015) (listing "competition with the corporation by officers or directors" and "usurpation of a corporate opportunity" as two of many ways a director can breach his fiduciary duty of loyalty to the corporation); RESTATEMENT (SECOND) OF RESTITUTION § 43m, cmt. d (2011) (recognizing "competing with the beneficiary" can breach one's fiduciary duty).[5] The two breaches are distinct; they are not coterminous or mutually exclusive. *See Sci. Accessories Corp.*, 425 A.2d at 964; *Brown*, 1977 WL 2566, at *5-6; 1 BALOTTI & FINKELSTEIN, at § 4.16.

Although the majority suggests Appellants were not obligated to file special exceptions because Longview pled "none of the elements of a viable cause of action," Longview pled factual

---

[5] Numerous other jurisdictions similarly recognize that a corporate director's operation of a competing company can "work injury to the corporation, or . . . deprive it of profit or advantage." *Guth*, 5 A.2d at 510; *see, e.g.*, *Slosberg v. Callahan Oil Co.*, 7 A.2d 853, 855 (Conn. 1939); *Red Top Cab Co. v. Hanchett*, 48 F.2d 236, 238 (N.D. Cal. 1931); *Coleman v. Hanger*, 275 S.W. 784, 789 (Ky. 1925); *Blakeslee v. Sottile*, 194 N.Y.S. 752, 753-54 (N.Y. Sup. Ct. 1922); *Hussong Dyeing Mach. Co. v. Morris*, 89 A. 249, 250 (N.J. Ch. 1913). Thus, there is no merit to Huff and D'Angelo's issue that competition, without some additional breach of duty, is insufficient to establish liability.

allegations and legal conclusions that, independently, raise all of the elements of a cause of action for competition. In the "Breach of Fiduciary Duty/Usurpation of a Corporate Opportunity" subsection under the Claims section, Longview pled in paragraph 55, "D'Angelo and Huff owe Longview a duty of loyalty." In paragraph 59, Longview alleged, "By diverting the Eagle Ford opportunity to themselves, D'Angelo and Huff placed themselves in a position of conflict or competition with Longview." In paragraph 62, Longview pled, "D'Angelo and Huff's breaches of duty and usurpation of Longview's opportunity proximately caused Longview injury and damages." In paragraph 54, Longview alleged Huff leased acreage through Riley-Huff rather than Longview because HEF would obtain 99% of the profits from Riley-Huff but only 39-40% of the profits through Longview. Longview also requested a constructive trust for Appellants' "breaches of fiduciary duty," and a constructive trust is a remedy for unjust enrichment under Delaware law. *See Guth*, 5 A.2d at 510.

Paragraph 62 alleged Longview was injured by "D'Angelo and Huff's **breaches** of duty **and** usurpation of corporate opportunity" (emphasis added). "Breaches" is the plural of "breach," and the plural denotes more than one. AMERICAN HERITAGE DICTIONARY (5th ed. 2014) ("plural"). "And" means "in addition to" or "added to." *Id.* ("and"). The literal meaning of the allegation in paragraph 62 is that Huff and D'Angelo committed two or more breaches of fiduciary duty *in addition to* usurpation of a corporate opportunity. Paragraph 62 expresses Longview's intent to pursue multiple theories for breach of fiduciary duty other than usurpation of a corporate opportunity. Thus, Longview alleged (1) a fiduciary duty; (2) "breaches" of fiduciary duty in addition to usurpation; and (3) injury and unjust enrichment.

Appellants argue Longview's live pleading was unclear about whether one of the "breaches" it was alleging was by competition. If Appellants believed Longview's pleading was obscure, misleading, or ambiguous about its legal theories of recovery, they should have filed

special exceptions. *See* TEX. R. CIV. P. 91; *Stone*, 554 S.W.2d at 187; *Hammer*, 400 S.W.2d at 889;

*Howard*, 786 S.W.2d at 393. When a party does not file special exceptions to a pleading, the

pleading must be construed in the pleader's favor and upheld "as to a cause of action that may be

reasonably inferred from what is specifically stated, even if an element of the cause of action is

not specifically alleged." *Boyles*, 855 S.W.2d at 601; *accord Horizon/CMS*, 34 S.W.3d at 897.

Longview clearly alleged the first and third elements of a breach of fiduciary duty claim under

Delaware law and ambiguously alleged the second element of breach. Appellants did not specially

except. Therefore, Longview's pleading must be construed to uphold any cause of action that can

be reasonably inferred from the rest of Longview's pleading. *See Horizon/CMS*, 34 S.W.3d at 897;

*Boyles*, 855 S.W.2d at 601.

To plead a cause of action, Texas's pleading rules require the allegations of a factual

situation that entitled it to obtain relief. *See* TEX. R. CIV. P. 45, 47; *see also Loaisiga*, 379 S.W.3d

at 255; *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d at 437; *Deakyne*, 371 S.W.3d at 307. I

would hold Longview satisfied this requirement. In paragraph 18, Longview alleged Huff and

D'Angelo were directors of Longview. Under the subsection entitled "The Scheme and Its Roots,"

Longview pled:

> 29. Longview diligently educated its Directors concerning their duties of loyalty to
> the company. These duties demand absolute fidelity to Longview's interests and
> require an extra measure of diligence when a director may have divided interests
> by, for instance, simultaneously serving as a director, officer, partner, investor or
> manager of entities in competition with Longview. . . .
>
> . . . .
>
> 34. Not long after Huff, D'Angelo and their associates directed Longview to pursue
> the Eagle Ford, Riley-Huff was formed (on October 28, 2009). Huff operatives
> Dartley, D'Angelo, and Bloom were listed as Riley-Huff's Managers. Bobby Riley
> was listed as its President as well as a Manager.

In paragraph 26, Longview alleged, "Riley-Huff is a direct competitor of Longview; on information and belief, one or more of the Huff Energy companies is directly or indirectly the majority and controlling investor of Riley-Huff." In paragraphs 23, 24, and 25, Longview repeated its allegations that Riley-Huff was one of Longview's "direct competitors." In paragraph 42, Longview alleged D'Angelo and another Huff associate were managers of Riley-Huff, "a fact neither of them disclosed to Longview." Paragraph 50 reads:

> On the eve of the January 28, 2010 Board meeting, [a Huff associate] sent a letter on behalf of WRH Energy to Longview expressing its displeasure with Longview's management, especially with regard to asset acquisitions. . . . The letter did not disclose that the Huff parties had decided to pursue Eagle Ford opportunities through Riley-Huff and its other portfolio companies rather than Longview, nor that it already had negotiated a contract with Ford's company, Wyldfire.

In Paragraph 53, Longview alleged "Riley-Huff ultimately acquired through Wyldfire thousands of acres first identified and targeted by Longview and it obtained tens of thousands of acres from other sources." Paragraph 54 alleges, "By as early as April 2010, Huff Energy had dumped almost $40 million into Riley-Huff's Eagle Ford play, which—by no coincidence—was exactly what Longview had proposed to do only weeks earlier to its Board (and to Huff and D'Angelo as Directors)."

Delaware law entitles a corporation to relief if one of its directors forms or operates a competing company without the corporation's consent. *See Brown*, 1977 WL 2566, at *5; *Craig*, 166 A.2d at 446. Longview alleged (1) Huff and D'Angelo were directors of Longview (Paragraph 18, 54); (2) Huff and D'Angelo formed a company that was a competitor of Longview (Paragraphs 23, 24, 25, 26, and 34); (3) Huff and D'Angelo operated Riley-Huff in competition with Longview (Paragraphs 53-54); and (4) Huff and D'Angelo did not disclose to Longview that they had formed and operated Riley-Huff (Paragraphs 42, 50). It is reasonable to infer that if Huff and D'Angelo did not disclose the formation and operation of Riley-Huff to Longview, Longview did not approve

Huff and D'Angelo's formation and operation of Riley-Huff. *See Roark*, 633 S.W.2d at 809 (requiring courts to make reasonable inferences from pleader's factual allegations). Because Longview alleged a factual situation—Huff and D'Angelo's formation and operation of a competing company—that entitled it to obtain relief under Delaware law, Longview alleged a cause of action against Huff and D'Angelo for competition.

The petition gave fair notice of the competition claim. In the Factual Background of its pleading, Longview alleged facts supporting all essential elements of a competition claim against Huff and D'Angelo for competing with Longview through Riley-Huff. These allegations informed Huff and D'Angelo that their competition with Longview through Riley-Huff was an issue in the case and testimony regarding their competition through Riley-Huff would be relevant. *See Horizon/CMS*, 34 S.W.3d at 896. An attorney of reasonable competence could ascertain from the live pleadings that Huff and D'Angelo's secret formation and operation of a direct competitor was a basic issue in the case. *See Bowen v. Robinson*, 227 S.W.3d 86, 91 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). As the factual allegations in *Hammer*, *Garza*, and *Howard* were sufficient to give fair notice of a claim that was not specifically alleged in the Claims section of the pleading, so too did Longview's pleading give Appellants fair notice of a competition claim. *See Hammer*, 400 S.W.2d at 889; *Garza*, 164 S.W.3d at 616-17; *Howard*, 786 S.W.2d at 393. In addition to those factual allegations, Longview further pled legal conclusions that Huff and D'Angelo's conduct constituted multiple "breaches" of fiduciary duty in addition to usurpation and placed themselves in "competition with Longview." Thus, Longview's allegations present a stronger case for fair notice than the allegations did in *Hammer*, *Garza*, and *Howard*.

The majority gives no weight to these allegations under its newly created "themes" standard of construing pleadings. The majority notes that despite Longview's allegations regarding competition and Huff and D'Angelo's "breaches" of fiduciary duty other than usurpation, the

remainder of Longview's allegations thematically relate to usurpation—a different theory for a breach of fiduciary duty. There is no support in Texas law for construing pleadings in accordance with their themes—recurring, pervasive, dominant, or otherwise. Such a rule of construction adds unnecessary complexity where Texas courts historically have sought simplicity. *See Gunnells Sand Co.*, 389 S.W.2d at 597-98; 2 MCDONALD & CARLSON, § 7:2, at 177-80. The majority only demonstrates that Longview's usurpation allegations were more prevalent than Longview's competition allegations. But simply because a party alleges more facts and legal arguments in support of one cause of action than another, does not mean the other cause of action was not sufficiently pled. *See Hammer*, 400 S.W.2d at 889; *Howard*, 786 S.W.2d at 393. Thus, the majority misapplies Texas's fair-notice pleading standard and, as a result, I believe the majority errs in concluding Longview's pleading did not give fair notice of a competition claim.

### 2. By recasting formal defects and obscurities in Longview's pleading as a "no fair notice" issue, the majority further misapplies the liberal construction rule and gives no effect to Texas Rules of Civil Procedure 90 and 91.

By choosing not to specially except to Longview's live pleading, Appellants made no written objection to any defect or obscurity in Longview's live pleading in the trial court. *See* TEX. R. CIV. P. 90, 91. Rules 90 and 91 require a party who wishes to complain about a pleading's defects or obscurities to identify the defect or obscurity in writing and to bring the special exception to the trial court's attention. TEX. R. CIV. P. 90, 91. Otherwise, all complaints about a pleading's defects and obscurities are waived. TEX. R. CIV. P. 90; *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex. 1992); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 233 (Tex. App.—San Antonio 2001, pet. denied). When a party chooses not to specially except in accordance with Rules 90 and 91, then the opposing party is given no opportunity to correct the pleading defect or obscurity and, therefore, courts must liberally construe the pleading in the

pleader's favor and uphold any claim or defense that is reasonably inferable from what is contained in the pleading. *Horizon/CMS*, 34 S.W.3d at 897.

In this context, the liberal construction rule is intended to assist courts in construing a party's pleading when the pleading contains defects and obscurities, formal and substantive, about which opposing parties have waived all complaints. *See id.*; *Roark*, 633 S.W.2d at 810. Unless a pleading is devoid of factual or legal allegations from which a claim or defense can be reasonably inferred, "no fair notice" arguments raised without a special exception in the post-pleading phases of litigation—such as the summary judgment phase or, as in this case, at the charge conference—should be resolved in the pleader's favor. *See Horizon/CMS*, 34 S.W.3d at 897; *Roark*, 633 S.W.2d at 809-10; *see also Med. Disc. Pharmacy, L.P. v. State*, No. 01-13-00963-CV, 2015 WL 4100483, at *12 (Tex. App.—Houston [1st Dist.] July 7, 2015, no pet.) (mem. op.) (applying fair-notice standard and liberal construction rule in determining whether pleadings supported submission of jury question); *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 221 (Tex. App.—San Antonio 2012, pet. denied) (applying the fair-notice standard and liberal construction rule in the summary judgment context). If formal pleading defects and obscurities—the complaints about which have been waived—could properly be recast as "no fair notice" arguments, then special exceptions would serve little to no purpose, the waiver rule provided in Rule 90 would have no effect, and the past 170 years' liberalization of Texas's pleading standard to prioritize substantive rights over compliance with technical rules would be largely undone. *See* 2 MCDONALD & CARLSON, § 7:2, at 177-80.

The majority recasts Longview's pleading defects and obscurities, about which Appellants have waived all complaints under Rule 90, as reasons why Longview did not give fair notice of a competition-based theory of liability. Although using other words, the majority faults Longview for obscurities created by the inclusion of obfuscatory legal allegations, and its failure to comply

with Rules 45 and 47(a)'s requirement that the statement of its causes of action be "short" and "concise," and with Rule 50's requirement that each paragraph averring a claim be limited as far as practicable to a single set of circumstances.

The majority cites several pleading defects and obscurities as reasons why Appellants had no fair notice of a competition claim. First, the primary basis for the majority's holding is that the over-abundance of usurpation allegations obscured whether Longview intended to pursue a claim based on its competition allegations (an obscurity and arguable defect under Rules 45 and 47). Second, the majority notes Longview's pleading fails to include a separate paragraph in the Claims section in which Longview clearly states it is alleging competition as an independent cause of action (an arguable defect under Rule 50). Third, the majority notes Longview's request for a constructive trust was unclear because Longview had one request based solely on usurpation while it had a second, broader request for a constructive trust based on Huff and D'Angelo's "breaches" of fiduciary duty (an obscurity). Fourth, it notes that Longview characterized its other theories of recovery, such as fraud and tortious interference, "in terms of" usurpation (an obscurity). The majority claims it has liberally construed Longview's pleading in Longview's favor, but it has not done so in a way that effectuates the purpose of Rules 90 and 91, which require that a party file written special exceptions or waive any complaint about a pleading's defects and obscurities.

Appellants express a concern that if a party were to file an excessively long pleading and allege barely sufficient facts that comprise a claim or defense, an opponent would be deemed to have fair notice. However, a litigant has mechanisms available to address excessively long pleadings in which claims could be buried. First, a party can file special exceptions and force an opposing party to re-plead its causes of action shortly and concisely in separate paragraphs without extraneous, obfuscatory allegations. *See* Tex. R. Civ. P. 45, 47, 49, 50, 90, 91; *see also* 2

MCDONALD & CARLSON, §§ 9:25, 9:27.[6] Second, the party can serve interrogatories and requests for disclosures to have the opposing party identify their legal theories. *See* TEX. R. CIV. P. 194.2(c), 197.1. Third, the party can file a Chapter 10 motion for sanctions for attorney's fees when an opposing party files a pleading intended to delay or needlessly increase the cost of litigation. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 10.001(1), 10.002-.005 (West 2002). Given Texas courts' efforts to liberalize the pleading standard, the greater concern is creating a technical, yet amorphous standard that—even in the absence of special exceptions—requires a party to plead claims and defenses in terms of prominent themes.

Ultimately, Appellants' failure to specially except in the trial court defeats the arguments they raise in their post-submission briefing. The purpose of special exceptions is to force clarification and specification when a pleading is defective or obscure. *See Hefley*, 131 S.W.3d at 65; *Stone*, 554 S.W.2d at 187; *Howard*, 786 S.W.2d at 393. Had Appellants filed special exceptions identifying the defects and obscurities upon which the majority bases its holding, Longview would have had the opportunity to correct and clarify its pleadings to address those alleged defects and obscurities. *See Horizon/CMS*, 34 S.W.3d at 897. By choosing not to file special exceptions, Appellants deprived Longview of the opportunity to correct and clarify its pleadings. *See id.* Longview should not be penalized on appeal because Appellants chose not to specially except in the trial court.

## C. *The trial court properly construed Longview's pleading so as to do substantial justice.*

Longview argues the record confirms Appellants were informed and aware that Longview was pursuing a theory of liability based on Huff and D'Angelo's competition through Riley-Huff.

---

[6] "If the trial court properly sustained the special exceptions and the plaintiff refuses or fails to amend, the trial court does not err in dismissing the cause of action." *Connolly v. Gasmire*, 257 S.W.3d 831, 838 (Tex. App.—Dallas 2008, no pet.).

Trial courts must construe "[a]ll pleadings . . . so as to do substantial justice." TEX. R. CIV. P. 45.

When a pleading is ambiguous as to the legal theories upon which the pleader relies, courts must

balance "the intent of the rules to eliminate technicality" and the need to ensure all "parties are

aware of the basic controversies to be settled." *See* 2 MCDONALD & CARLSON, § 7:4, at 191. Such

determinations must be made on a case-by-case basis. *Id.* (citing *Murray v. O & A Express, Inc.*,

630 S.W.2d 633, 636 (Tex. 1982)). Courts apply "a standard of convenience and fairness, bearing

in mind the positions of the parties and such pertinent factors as their means of knowledge of the

facts and access to necessary evidence." *Id.*; *see Hammer*, 400 S.W.2d at 889 (considering request

for admission in determining whether a party had fair notice of theory of breach of duty in

negligence suit).[7]

The record is replete with clear indications that confirm Appellants had fair notice of

Longview's claim of a breach of fiduciary duty by competition. At the very least, the following

---

[7] *See, e.g.*, *Fountains Int'l Group, Inc. v. Summit Oak Dev., LLC*, No. 04-14-00205-CV, 2015 WL 1138418, at *3 n.2 (Tex. App.—San Antonio Mar. 11, 2015, no pet.) (mem. op.) (noting that language in the partial summary judgment was "an indication that Summit Oaks was well aware that Fountains International was seeking to recover interest accruing after September 14, 2002"); *U.S. Fire*, 399 S.W.3d at 221 ("Further, the record indicates that U.S. Fire was aware that one of the issues to be resolved at the bench trial was the amount of penalty interest owed on the $5 million in payments made by U.S. Fire. We conclude U.S. Fire had fair notice of Lynd's claim for statutory interest on the $5 million payment."); *Jefferson Cnty. Appraisal Dist. v. Morgan*, No. 09-11-00517-CV, 2012 WL 403861, at *2 (Tex. App.—Beaumont Feb. 9, 2012, no pet.) (mem. op.) (holding that although petition did not refer to 2006 tax year appraisal, record supported conclusion that petition's reference to 2005 tax year was mistake and "[t]here could be no confusion by the parties on that point"); *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 68 (Tex. App.—Texarkana 2004, pet. denied) (noting "the depositions of Russell and Lori Burke indicate that UPRC was well aware that the Burkes were seeking damages for the dead cattle and the decreased weight gain of the surviving cattle"); *Boorhem-Fields, Inc. v. Burlington N. R. Co.*, 884 S.W.2d 530, 534 (Tex. App.—Texarkana 1994, no writ) ("The record as a whole indicates that Boorhem-Fields had fair notice that the entire clearances provision was in dispute."); *Cartwright v. MBank Corpus Christi, N.A.*, 865 S.W.2d 546, 552 (Tex. App.—Corpus Christi 1993, writ denied) ("Construing the pleading with an effect to do 'substantial justice' and mindful that the Cartwrights were not prejudiced in their attempt to raise defenses against the note, we hold the pleadings sufficient to allow judgment . . . ."); *see also Lone Star Gas Co. v. Thomas*, 345 S.W.2d 844, 848 (Tex. Civ. App.—Fort Worth 1961, writ ref'd n.r.e.) ("The modern tendency is toward greater liberality in the construction of pleadings in order not to require the retrial of a case when justice has been done, and the parties understood what the points in issue were, and the same were submitted to a court or jury."); 2 MCDONALD & CARLSON, § 7:4, at 190 ("Notice is obtained not merely from the pleadings. The availability of discovery procedures relieves the pleader of the burden of alleging the details of a claim . . . as may be sought in preparation for trial.").

shows why Appellants could not argue they were surprised by Longview requesting the submission

of Question No. 2 at the jury charge conference.

- In their written response to Longview's motions in limine, Appellants noted, "The crux of Plaintiff's claim is a lack of disclosure on the part of the Huff Defendants with regard to the Huff Defendants' alleged competition with Longview. . . . The Confidentiality Agreement referenced in Plaintiffs Motion in Limine . . . provides disclosure to Longview that the Huff Defendants were in competition with Longview. This evidence is directly relevant to the Huff Defendants' defense in this litigation, and directly contradicts Plaintiffs primary theory in this case."

- Huff and D'Angelo also filed a motion to exclude Longview's expert Ronald J. Gilson. The motion, which was based not upon relevance but upon improper expert testimony, sought to exclude Gilson's opinions that under Delaware law "competition is prohibited" and Huff and D'Angelo were prohibited from "competing with Longview without disclosure." Huff and D'Angelo objected to Gilson's "testi[mony] that Huff and D'Angelo somehow competed with Longview in violation of an economic fiduciary "obligation" consistent with Delaware law." Huff and D'Angelo also objected to Gilson's "opin[ion] that Huff and D'Angelo 'prevented Longview from competing with economic interests of Huff entities.'"

- Huff and D'Angelo attached Gilson's deposition testimony as Exhibit A to their motion to exclude. Gilson's deposition testimony includes significant discussion of Huff's competition with Longview through Riley-Huff.

- Attached as Exhibit B to Huff and D'Angelo's motion to exclude was Longview's response to a request for disclosures in which Longview disclosed "the legal theories and . . . factual bases" for its claims. Longview explained Riley-Huff was "a competing company that the defendants formed shortly after Longview began investigating the Eagle Ford" and that D'Angelo served as a manager without disclosure to Longview. Longview further disclosed that "Huff and D'Angelo owed fiduciary duties to Longview by virtue of their position on the Longview board of directors. They breached these duties when they stole Longview's proprietary information, diverted the Eagle Ford opportunity to a competing entity from which they stood to gain a larger profit, and failed to present to Longview other opportunities to invest in the Eagle Ford." Longview listed D'Angelo and several others as persons with knowledge of relevant facts and stated they were "involved with several oil and gas companies that are direct competitors of Longview, including . . . Riley-Huff." The disclosures also mentioned Gilson's opinions, including the following: "The duties of directors are well known. . . . Reasonably prudent directors know that they must conform their behavior to a standard of conduct mandating that their first loyalties are to the corporation (not to their own self-interest or that of another organization) and to which they must be candid, make full disclosure, and avoid competing interests"; "During the critical investment period (late 2009/early 2010), neither Huff nor D'Angelo disclosed to Longview's board that Huff Energy was investing heavily in the Eagle Ford trend or that Longview was in competition with Riley-Huff for Eagle Ford acreage, including acreage available through Wyldfire"; and "Huff and D'Angelo acted in competition with Longview

while they were in possession of information that Longview had provided to them." The disclosures also mentioned the following expert opinion of Robert Valdez: "Anyone who is a director of a corporation knows that he or she must be strictly faithful and loyal to the company. This means that a director who has a conflict of interest or who wants to compete with the company must first get the permission of the majority of other directors."

■ Longview filed a motion to exclude the testimony of Gilbert Herrera, an expert witness for Appellants. Longview noted Herrera was hired to compare the "due diligence of competing oil and gas companies—Longview Energy and Riley-Huff." Longview argued Herrera's opinion as to the reasonableness of Huff's evaluation of Longview's due diligence was irrelevant because "Huff and D'Angelo, as board members, *owed a fiduciary duty not to compete with Longview*," (emphasis in original) and cited authority supporting that Delaware law recognizes competition as a breach of duty separate from usurpation of a corporate opportunity.

■ Attached to Longview's motion to exclude was a defendant's response to a request for disclosure stating, "Herrera will . . . testify regarding the industry practice and/or custom that is associated with private equity investors having more than one portfolio company competing for the same and/or similar investment, including investments in competing oil and gas companies. . . . Herrera shall opine that it is common . . . for investors, like the Huff Defendants, to make and/or consider investments in companies that may compete in the same industry and/or area."

■ In Longview's response to Riley-Huff's motion to expunge *lis pendens*, Longview's Preliminary Statement begins with the assertion that "Defendants stole oil and gas leases properly belonging to Longview and lodged them in Riley-Huff, an entity established and maintained for the express purpose of illegally competing with Longview."

The record confirms Huff and D'Angelo were informed and aware that their unapproved competition with Longview through Riley-Huff was a basic issue to be settled at trial, and testimony regarding this issue would be relevant. *See Horizon/CMS*, 34 S.W.3d at 896. Thus, the trial court properly construed Longview's pleading "so as to do substantial justice." TEX. R. CIV. P. 45; *accord Howell v. Mauzy*, 899 S.W.2d 690, 707 (Tex. App.—Austin 1994, writ denied) ("Technical rules of pleading cannot defeat a right substantially alleged.") (citing *Barnes v. Patrick*, 105 Tex. 146, 146 S.W. 154, 155 (1912)); *see also De Loach*, 128 F.2d at 380; 2 MCDONALD & CARLSON, § 7:4, at 189, 191.

### D. Conclusion

Longview's pleading contained factual allegations that Huff and D'Angelo, while active directors on Longview's board, formed and operated a competing company, Riley-Huff, without disclosing this competition to Longview or seeking its prior approval. Under Delaware law, this is a breach of fiduciary duty separate from usurping a corporate opportunity. In the absence of special exceptions, Longview's live pleading was sufficient to give Appellants fair notice that Huff and D'Angelo's competition with Longview through Riley-Huff was one of the "breaches" of fiduciary duty to be resolved at trial. Applying nearly 170 years of Texas jurisprudence in considering Longview's allegations, and liberally construing them in Longview's favor, I would hold Longview gave fair notice of a competition claim. The trial court's overruling of Appellants' objection to the submission of Question No. 2 is further supported by clear evidence in the record confirming that Appellants were given fair notice—through pleadings, interrogatories, disclosures, motions in limine, and expert deposition testimony, including Appellants' own defense expert's hired to rebut Longview's competition allegations—that Longview intended to prove a breach of fiduciary duty based on Huff and D'Angelo's direct competition with Longview by forming and operating Riley-Huff. Question No. 2 regarding competition was supported by the pleadings, and thus the trial court did not err by submitting the question to the jury.[8]

## V
### CONSTRUCTIVE TRUST & MONETARY AWARD

Appellants raise numerous other issues, arguing that Longview is not entitled to either a constructive trust or monetary relief and, alternatively, Longview may not recover both. As

---

[8] I would further hold Riley-Huff's liability for aiding and abetting was established through the jury's findings, which were supported by sufficient evidence that Riley-Huff knowingly participated in Huff and D'Angelo's breach. Under Delaware law, Riley-Huff can be held liable for aiding and abetting a breach of fiduciary duty. *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001); *O'Malley v. Boris*, 742 A.2d 845, 851 (Del. 1999).

explained below, I would sustain Appellants' issues regarding the trial court's error in not accounting for Riley-Huff's developments costs, and reverse and remand for further proceedings. I would overrule Riley-Huff's remaining issues.

## A. *Explanation of the Jury Findings & Trial Court's Judgment*

After finding Huff and D'Angelo breached their fiduciary duty to Longview, and that Riley-Huff was liable for knowingly participating in their breach, the jury found Riley-Huff acquired assets in the Eagle Ford shale "as a result of" the breach. The jury also answered four valuation questions regarding Riley-Huff's Eagle Ford assets:

> The market value of the assets in the Eagle Ford shale that Riley-Huff acquired as a result of Huff and D'Angelo's breach was **$42 million**.

> The amount Riley-Huff paid for its assets in the Eagle Ford shale was **$24.5 million**.

> The amount of past production revenues Riley-Huff derived from the wrongfully acquired assets in the Eagle Ford shale was **$120 million**.

> Riley-Huff paid **$127 million** to develop the assets it acquired in the Eagle Ford shale.

Longview acknowledged during oral argument that it may recover either (1) the assets in a constructive trust or (2) the assets' market value of $42 million. Longview requested that the trial court impose a constructive trust on the Eagle Ford assets Riley-Huff acquired as a result of Huff and D'Angelo's breach of fiduciary duty. Riley-Huff requested an offset against the constructive trust for its acquisition and development costs, but Longview argued Riley-Huff was akin to a bad-faith trespasser and thus not entitled to offsets for development costs.

Granting Longview's request, the trial court awarded Longview a constructive trust on the Eagle Ford assets rather than the assets' market value of $42 million. The trial court also awarded Longview $120 million for the value of the past production revenues. Although the trial court offset the $120 million by the $24.5 million in acquisition costs, it did not offset Riley-Huff's

development costs of $127 million. As a result, the judgment awards Longview a constructive trust (without offsets) and an additional $95.5 million.

The trial court granted Longview an equitable interest in and imposed a constructive trust "over all right, title and interest of Riley-Huff in and to" the Eagle Ford assets identified by the judgment. It ordered Riley-Huff "to execute and deliver to Longview all instruments and documents and to do all acts and things as may be necessary to fully transfer, convey, grant, or assign to Longview the legal title to all of the respective properties, rights and interests." The trial court specified the leases by reference to two of Appellants' trial exhibits, Exhibits 2166 and 2860. Exhibit 2166 contained all of the actual Eagle Ford leases at issue in the case, and Exhibit 2860 was a list of those leases.

The trial court incorporated Exhibit 2860 as two exhibits to the judgment: Exhibit A contains all leases Riley-Huff executed between January 2010 and February 2011, and Exhibit B are those leases "expressly excluded from the Constructive Trust" that Riley-Huff acquired "pursuant to the 'BGE' transaction and the 'Maali' transaction" and executed before January 2010. Also included in the constructive trust are ancillary interests related to the included leases; wells located on the leased acreage; all oil, gas, and other minerals produced therefrom; all production revenues derived therefrom, from June 2, 2012 (the date of the jury's verdict) until the date of transfer of the assets; and all documents and records related to the leases.

## B.  *Standard of Review & Applicable Law*

Under Texas law, the imposition, scope, and application of a constructive trust is generally left to the trial court's discretion. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied). A trial court abuses its discretion if it acts arbitrarily, unreasonably, without reference to any guiding rules and principles, or without supporting

evidence. *Id.* Because the parties agreed in the trial court that Delaware law applies to remedy issues, Delaware law provides the applicable guiding rules and principles.

Under Delaware law, the "imposition of a constructive trust upon all profits derived from the competing [company]" is a proper remedy for a breach of fiduciary duty by competition. *Brown*, 1977 WL 2566, at *5; *see Guth*, 5 A.2d at 510. A constructive trust "is an equitable remedy of great flexibility and generality." *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993). Under Delaware law, the purpose of a constructive trust in the corporate context is to ensure a corporate director does not profit from breaching his fiduciary duty of loyalty. *Guth*, 5 A.2d at 510. "[T]he duty to transfer the property relates back to the date of the wrongful act that created the constructive trust." *Hogg*, 622 A.2d at 652.

## C. The $95.5 Million Award

Appellants argue the trial court erred by denying Riley-Huff's request for offsets against the constructive trust and not awarding reimbursement for Riley-Huff's development costs of $127 million.[9] Longview's basis for the $95.5 million award in addition to the constructive trust is that Riley-Huff was akin to a bad-faith trespasser and did not prove its development costs were reasonable and necessary. Thus, the propriety of the $95.5 million award turns on whether, under Delaware law, Riley-Huff is entitled to offsets against the constructive trust for its development costs.

Delaware law limits constructive trusts to disgorging unjust enrichment (profits or benefits). *See Guth*, 5 A.2d at 510. Recognizing this principle, Delaware courts award offsets when imposing a constructive trust without regard to bad faith or whether the expenses were "reasonable

---

[9] In the same issue, Appellants also argue that the constructive trust's inclusion of post-verdict production revenues should have been limited to profits. In accordance with this section's conclusion, I would also hold the trial court abused its discretion by not limiting the constructive trust to post-verdict profits.

and necessary." *See Walker v. Res. Dev. Co. Ltd., L.L.C. (DE)*, 791 A.2d 799, 818 (Del. Ch. 2000); *see, e.g.*, *Hayward v. Green*, 88 A.2d 806, 812 (Del. 1952). Longview cites no authority, and I found none, that under Delaware law, a constructive trust may include more than profits or benefits when a corporate director breaches his fiduciary duty in bad faith. I would hold the trial court erred by awarding Longview $95.5 million in addition to the constructive trust because it did not account for Riley-Huff's development costs of $127 million. *See Guth*, 5 A.2d at 510.

## D. *Constructive Trust*

Appellants argue the judgment is defective because the constructive trust language is "void for vagueness" and violates the statute of frauds; the constructive trust violates the rights of third parties; Longview did not trace the leases in the constructive trust to usurping a corporate opportunity; and the constructive trust gives Longview an inequitable windfall.

I would overrule Appellants' vagueness, statute-of-frauds, and "rights of third parties" issues. The judgment clearly orders Riley-Huff to transfer all rights, title, and interests in and to certain leases, which the judgment specified by reference to the actual lease documents from a trial exhibit that Appellants offered. *See Hogg*, 622 A.2d at 652 ("[T]he only duty of the constructive trustee is to transfer the property to the equitable owner."); *see also Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983) (noting judgments satisfy statute of frauds by including property description or "by reference to other identified writings"). The lease documents provide that the lessors may not unreasonably withhold their consent to Riley-Huff's assignment of interests or that Riley-Huff may assign its interest without the lessors' consent.

I would also overrule Appellants' "tracing" issues. Because the jury found Riley-Huff wrongfully acquired Eagle Ford leases "as a result of" Huff and D'Angelo's breach, and D'Angelo admitted Riley-Huff and Longview were both trying to "get into Eagle Ford shale and acquire leases," the only relevant factual question the jury did not answer was, "What are the interests in

Eagle Ford leases that Riley-Huff acquired in trying to 'get into Eagle Ford shale and acquire leases'?" The trial court admitted Appellants binders of leases that they represented were leases Riley-Huff acquired in the Eagle Ford shale. Counsel for Riley-Huff confirmed at oral argument "everything that Riley-Huff owned or at one time may have owned or had a part of is in those binders" and the binders were offered at trial to show that of all the leases Riley-Huff purchased, none were inside Longview's claimed "corporate opportunity." There was no dispute at trial, nor is there a dispute here on appeal, as to what interests in Eagle Ford leases Riley-Huff acquired in competing with Longview in trying to "get into Eagle Ford shale and acquire leases." Because jury findings are necessary only when material facts are disputed, I would overrule these issues. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 596 (Tex. 2008).

Appellants repeatedly emphasize that the windfall to Longview is "astounding" and the constructive trust is likely the largest imposed in Texas history. But context matters. In the corporate context, Delaware courts recognize the "sound public policy that it is better to give a windfall to a beneficiary than to let a faithless fiduciary benefit from his wrongdoing." *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1190 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000) (citing *Thorpe*, 676 A.2d at 445; *Guth*, 5 A.2d at 510). Appellants cite no authority that the size of a constructive trust necessarily affects its propriety. That the constructive trust might be the largest in Texas history, alone, shows nothing more than Huff and D'Angelo potentially committed the most profitable breach of fiduciary duty in Texas history. *See Guth*, 5 A.2d at 510 (explaining a constructive trust under Delaware law should disgorge all profits obtained as a result of a corporate breach of fiduciary duty).

## VI
### CONCLUSION

I would affirm the liability of Huff, D'Angelo, and Riley-Huff, but reverse the constructive trust and $95.5 million awards. I would remand the case for the trial court to reconsider an appropriate remedy in light of Riley-Huff's entitlement to reimbursement for its development costs. *See Drury Sw., Inc. v. Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 293-94 (Tex. App.—San Antonio 2011, pet. denied) (noting trial court should award prevailing party the greatest and most favorable relief supported by the record).[10]

Luz Elena D. Chapa, Justice

---

[10] Because the trial court could properly exercise its discretion to award a constructive trust if the case were remanded, I do not address the *lis pendens* issue.